Henry J. **TOOMBS** et al., Plaintiffs,

v.

**Ben W. FORTSON, Jr.,** as Secretary of State of Georgia, et al., Defendants.

**Civ. A. No. 7883.**

United States District Court
N. D. Georgia,
Atlanta Division.

April 1, 1965.

Francis Shackelford, Atlanta, Ga., for plaintiffs.

Eugene Cook, Atty. Gen., State of Georgia, B. D. Murphy, Atlanta, Ga., E. Freeman Leverett, Asst. Atty. Gen., State of Georgia, Elberton, Ga., Geo. P. Dillard, Herbert O. Edwards and Robert E. Mozley, Decatur, Ga., King & Spalding, Scott, Scroggins, Cash & Crim, Harold Sheats and John Tye Ferguson, Atlanta, Ga., for defendants.

Before TUTTLE and BELL, Circuit Judges, and MORGAN, District Judge.

PER CURIAM:

This opinion and order will conclude the second chapter in this case arising out of Georgia legislative malapportionment. For the first chapter see Toombs v. Fortson, N.D.Ga., 1962, 205 F.Supp. 248, where we held that either the House of Representatives or the Senate must be apportioned on the basis of population. We retained jurisdiction pending action by the Georgia Assembly to that end, and also pending decisions of the Supreme Court of the United States in cases involving the contention that both houses of a state legislature must be apportioned according to population. The General Assembly of Georgia met thereafter and reapportioned the Senate on the basis of population. Ga. Laws, 1962, Extra session, pp. 7, 14. The theoretical minimum of population necessary to control a majority of the seats in the Senate was raised from 21.4 percent to 48.2 percent. The disparity from the standpoint of population as between districts and thus between residents of the districts was reduced from a ratio of 42.5 to 1 to a ratio of 1.81 to 1. The eight largest counties, with 41.26 percent of the state population, now have twenty-one senators, or 40.7 percent of the total. The twenty-two largest counties, with 57.11 percent of the population have 29.5468 senators, or 54.72 percent. The average district should contain 73,021 people based on the population of Georgia. Four out of fifty-four districts are below this average by more than 15 percent while two exceed it by more than 15 percent. Three districts depart from the average by more than 18 percent.

Other litigation in Georgia involving the political process, collateral to this suit time-wise, involved the county unit system of elections for governor and United States senators. See Sanders v. Gray, N.D.Ga., 1952, 203 F.Supp. 158, modified and affirmed, 1953, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821, where the county unit system of elections was voided with the result that the present governor and one of the United States senators from Georgia have since been elected on the basis of popular vote. The Georgia political process as it related to the election of members of the national House of Representatives also came under attack

during this period. See Wesberry v. Vandiver, N.D.Ga., 1962, 206 F.Supp. 276, denying the relief sought, reversed on appeal sub. nom. Wesberry v. Sanders, 1964, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481. This case resulted in the redistricting of the ten Georgia congressional districts wherein the maximum population disparity as between them from the average now runs from a low of 16.4 percent below the average to 15.5 percent above the average. The General Assembly of Georgia accomplished this result. Ga. Laws, 1964, p. 478.

Shortly thereafter the Supreme Court rendered its decisions in Reynolds v. Sims, 1964, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506; WMCA, Inc. v. Lorrenzo, 1964, 377 U.S. 633, 84 S.Ct. 1418, 12 L.Ed.2d 568; Maryland Committee for Fair Representation v. Tawes, 1964, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595; Davis v. Mann, 1964, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609; Roman v. Sinock, 1964, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620; and Lucas v. Colorado General Assembly, 1964, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632, extending the one man-one vote principle established for the election process in Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821, supra, and followed in Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 506, 11 L.Ed.2d 481, supra, to state legislative representation and apportionment. These decisions, on motion of plaintiffs, activated this phase of the instant litigation for the purpose of requiring reapportionment of the Georgia House of Representatives on the basis of population. The motion of plaintiffs in this regard was granted by an order dated June 30, 1964, and amended on November 3, 1964. The order voided the apportionment section of the Georgia Constitution, Art. III, § III, par. 1 (Code Section 2–1501), as conflicting with the Fourteenth Amendment. Georgia Code § 47–101, as amended, giving effect to this section of the Constitution was declared prospectively null and void after the general election to be held in November, 1964. The order also provided:

"The motion of the plaintiffs for further injunctive relief prior to the conduct of the party primaries or conventions and the General Election of November 3, 1964, is hereby denied at this time, provided, however, that, notwithstanding anything in Article III, Section IV, Paragraph I (Code Section 2–1601) of the Constitution of Georgia of 1945 to the contrary, the service of the members of the House of Representatives of the General Assembly of the State of Georgia to be elected at the General Election in November, 1964, shall be limited to a term of one year's duration and provided further that the plaintiffs shall have the right to reapply to this Court for further relief should the General Assembly, which convenes in January, 1965, fail to enact, during the regular 1965 45-day session, as provided in the Georgia Constitution, such legislation as may be necessary for the General Assembly to be reapportioned in accordance with Constitutional requirements and as may be necessary to permit the holding of elections to the newly constituted General Assembly during the calendar year 1965, which elections are to be held at such time as may be necessary to permit the members of such newly constituted General Assembly to take office no later than the second Monday in January, 1966. To the extent that state statutory and constitutional provisions might otherwise conflict with such legislative reapportionment, they are hereby declared to be void and of no effect."

The General Assembly has acted pursuant to this order with the result of setting the number of seats at 205 (H.B. 281). These seats are apportioned among House districts created in H.B. 367. Special elections to fill the vacancies created by H.B. 367 are set up under H.B. 580. All of this legislation has now become law on the approval of the Governor.

## THE ISSUES

On March 10, 1965, defendant Ben W. Fortson, acting in his official capacity, moved for approval of the plan of reapportionment. Plaintiffs have responded that the plan fails to comport with the teaching of the Supreme Court in Reynolds v. Sims, supra, and related cases, and have asked the court, in substance, to reject the plan and to adopt a plan of its own in lieu thereof. We allowed the House of Representatives to intervene as a proponent of the plan, and to seek relief from our order with respect to their terms of office so as to allow the members of the House to serve out the remaining one year portion of their current two-year terms, or failing in this, to allow named classes of the membership, variously affected or unaffected by the reapportionment plan, to serve out the balance of their respective terms.

The intervention of the Executive Committee of the Republican Party of Georgia was permitted so that they might contest the special election procedure embraced in House Bill 580. Fulton County and one of its Senators intervened for the purpose of seeking to correct a clerical error and certain oversights having to do with the districting of Fulton County. In addition, various *amicus curiae* briefs have been allowed and considered.

## THE ADEQUACY OF THE PLAN OF APPORTIONMENT

We come first to the adequacy of the plan in the light of the interpretation placed on the equal protection clause of the Fourteenth Amendment by the Supreme Court in Reynolds v. Sims, supra; and with respect to the objections to the mode of election, in the context of the order of this court that reapportionment be accomplished during 1965.

House Bill 367 and House Bill 281, although enacted separately, constitute the apportionment plan and together with House Bill 580, the response to this Court's order. House Bill 580, as stated, was enacted to effect the necessary special election under the plan. Prior to the order of this court and to the enactment of these statutes, House apportionment was governed by Article III, § III, Paragraph 1 of the Georgia Constitution of 1945 (§ 2–1501 of the Georgia Code). The membership was composed of three members from the eight counties with the largest population, two members from each of the thirty counties having the next largest population, and one member from each of the remaining one hundred and twenty-one counties or a total of 205 representatives from Georgia's 159 counties. The new statutes provide for the same number of seats but for a different apportionment. Plaintiffs assert that the number of seats is unnecessarily high, and that the apportionment bill reflects a clearly proscribed violation of the one man-one vote principle.

■ The determination of the size of the House is a matter within the discretion of the State. Reynolds v. Sims, supra, footnote 63, p. 581, 84 S.Ct. p. 1362, 12 L.Ed.2d 506. We therefore reject the attack on this portion of the plan.

It is next urged that the plan of apportionment, shown on the map attached hereto as Appendix A, is a mere hodge podge or crazy guilt and thus without rationality. The court heard the testimony of the Chairman and Vice Chairman of the House Rules Committee. Their testimony was that they followed the one man-one vote principle within the framework of the exception or variance stated in Reynolds v. Sims, supra, based on the policy of according independent representation to political subdivisions, that is to say, counties.[1] They

---

1. Reynolds v. Sims, p. 580, 84 S.Ct. p. 1391:

   "A consideration that appears to be of more substance in justifying some deviations from population-based representation in state legislatures is that

of insuring some voice to political subdivisions, as political subdivisions. Several factors make more than insubstantial claims that a State can rationally consider according political subdivisions some independent repre-

testified in detail as to the basis of the multi-county districts, some of these being grouped according to trade areas, economic interests, historical relationships and the like as well as because of the desire of representatives of certain small counties that their counties be joined or not joined with adjacent larger counties. We have concluded from their testimony that the plan is not without a rational basis. This finding however is without respect to the variances in population as between the districts which will be the subject matter of separate consideration hereinafter.

The overall statistics of the plan reflect vast improvement. The theoretical minimum of population to which is allocated a majority of the seats has been improved from 22.5 percent to 42.341 percent. The disparity between counties [2] has been improved from a ratio of 98 to 1 under the old plan to 2.003 to 1 under the new plan. However, the ratio and theoretical minimum test is not the end of the matter. The controlling principle is one man-one vote which means that the ratio and theoretical minimum would coincide, but as was noted in Reynolds v. Sims, "[m]athematical exactness or precision is hardly a workable constitutional requirement," and some variances will be permitted to allow voice to political subdivisions. However, the rule of equality in the population of districts as near as practicable means just that and each district should be composed "as near as practicable" of the average population. The average here is 19,236 based on the total 1960 state population of 3,943,116.

The Chairman of the Rules Committee testified that the plan was largely based upon considerations of constituting as many counties as possible into separate districts so as to afford them separate representation within the exception recognized in Reynolds v. Sims. He testified that this was done by working from

the average out to variances substantially in line with the variances in the Georgia Senate apportionment. The fault of both the Senate and House plans, if any, lies not in a lack of rationality, but in departures from the average to a prohibited degree. No objection was filed to the Senate plan and it was thus logical and natural for the House to follow it, but, of course, the umbrella of Reynolds v. Sims, decided after that plan was promulgated, had to be considered. And there the Supreme Court indicated in three places by way of a dictum that a dilution of a vote to the extent of a two to one ratio could not stand.

The Supreme Court has not set a maximum permissible departure from the average but has determined to give effect to the requirement of population-based apportionment on an ad hoc basis. See Roman v. Sincock, supra, p. 710, 84 S.Ct. p. 1458. It was there stated that:

"* * * the proper judicial approach is to ascertain whether, under the particular circumstances existing in the individual State whose legislative apportionment is at issue, there has been a faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination."

In spite of this admonition, it is apparent that the legislative process would be facilitated by the establishment of a maximum standard of variance. The application of a test by the court is a far simpler thing than the give and take of the political arena where the plan is fashioned. It would appear here, for example, that the plan could have been confined to a pattern of more limited variance had not the maximum variance in the Senate plan been used as the outer limit. Plaintiffs submitted plans "A" and "B", the first being somewhat similar to the plan in question and the

---

sentation in at least one body of the state legislature, as long as the basic standard of equality of population among districts is maintained. * * * "

2. Appendix "B" reflects the variances as between the counties from the average.

other being based on an allocation of House seats to senatorial districts, and the maximum variance in each was between eleven and twelve percent.

The fixing of a maximum variance in the sense of imposing a heavier burden to justify anything more is perhaps the intent of the bill now pending in the United States Senate, and which has passed the House, setting the maximum variance in congressional districting at fifteen percent from the average. See 33 L.W. 2472, 2482. This is in line with the recommendation of the American Political Science Association as we noted in Wesberry v. Vandiver, supra. Of course, this does not mean a deliberate built-in variance of this degree but a good faith effort to meet the average with departure only where necessary to afford individual representation to as many counties as possible.

██ We decline to set a mathematical formula to be followed but we do hold that a variance of more than 15 percent would be difficult, if not impossible, to justify. It may be that there will be some later elucidation by the Supreme Court on this complex question but until such event occurs, we will base any test as to the reasonableness of variances on the departure figure of 15 percent. So tested, it is apparent that the House apportionment in question, as well as the apportionment of the Senate are constitutionally insufficient.

Without detailing the prohibited variances in the House plan, we think it sufficient to point to a few of the more vulnerable aspects of it. Correlating districts to counties, it appears that the smallest district has a population of 12,-131 while the largest has a population of 23,860. Thus the smallest district was 36.93 percent below the state average while the largest district was according to appendix "B" 24 percent above the average. The following chart demonstrates the disparity in representation as related to the total population of 3,943,-116:

| Percentage Departure From Norm | No. of Districts | Total Population of Districts |
|---|---|---|
| 35–36.93% below | 2 | 49,914 |
| 35–35% below | 6 | 91,397 |
| 25–30% below | 11 | 193,096 |
| 20–25% below | 9 | 163,345 |
| 15–20% below | 3 | 63,641 |
| 0–15% below | 42 | 1,089,687 |
| 0–15% above | 31 | 984,069 |
| 15–20% above | 13 | 478,134 |
| 20–25% above | 24 | 830,305 |

Defendants argue that the balance of power in the House has shifted to the so-called urban areas. This is demonstrated by the fact that the twenty-two largest counties having 57.11 percent of Georgia's population will elect 104.9961 representatives or 51.217 percent of the House members. Granting this to be the case, the fact is that the weight of the vote of citizens of some districts is diluted to the extent of as much as fifty percent and this is the continuing fault which gives rise to the constitutional problem. It may be that the theoretical minimum is substantially in line and that the rural-urban question has been put to rest; nevertheless, the substantial discrimination as between citizens of some of the districts when compared to the representation status of citizens of

some of the other districts leaves the plan out of line. Instead of a 2–1 ratio in the House and a 1.81 to 1 ratio in the Senate, the ratio based on a fifteen percent variance could not exceed 1.353 to 1, and thus might be justified as an insubstantial or non-invidious difference.

The apportionment in each instance continues to violate the equal protection clause of the Fourteenth Amendment and must be corrected. This leaves the question of when and how.

## THE REMEDY

This litigation from its inception has been marked by diligence on the part of counsel for plaintiffs to gain the fair representation that will result from constitutional apportionment. It has also been marked by a desire on the part of the State to manage its own affairs to the end of bringing its apportionment in line with constitutional standards. The present result approaches that standard but, as stated, has not yet reached it.

We deem the duty of the court in a case such as this to rest on two considerations. First, the constitutional rights of plaintiffs must be accorded, and, if possible, by the state and not the court. Second, this should be accomplished within the ambit of the public interest that is involved in allowing the state political and governmental process to function in a manner so as to do as little harm as possible to other areas and functions for which the state is responsible.

Substantial progress toward the goal of fair representation has been made. True, there is a ways to go and it is to be hoped that the reapportioned General Assembly will now finish the job. In any event we have determined to accept the proposed House plan of apportionment and the current Senate plan of apportionment as interim plans to be used on stated conditions and until proper apportionment becomes a fact. We are persuaded to this course by the view that the General Assembly of Georgia has been inordinately involved in apportionment since the fall of 1962, and for that reason have concluded to withhold further action in the case until the end of the 1967–68 regular session of the General Assembly, or May 1, 1968, whichever may be the earlier.

This will afford an opportunity to the legislature as now approved for the remainder of this term to observe the workings of the body in which for the first time there will be multi-county representatives and increased representation for many counties. Such study may add materially to the skill brought to bear in the following session of the General Assembly in finally bringing the membership within constitutionally acceptable standards. It will, among other things, afford an opportunity to test the joinder of counties as to the various factors of compatibility heretofore referred to, and it will afford an opportunity to consider the relative merits of county-wide versus district representation in multi-district counties. It may, in sum, permit a much more objective and more scientific solution to the difficult problem that remains to be resolved.

Constitutionally valid legislative apportionment plans for the Senate and House must be enacted during this period of delay in line with what we have said in this opinion and in line with teachings of the opinions of the Supreme Court. In the event Georgia so acts by the end of this period, and should action have been taken to adopt a constitutional or statutory requirement that legislative reapportionment be effected immediately after each decennial census, it would be appropriate for the court to entertain a motion to terminate this litigation.

In accepting the House plan on an interim basis, it becomes necessary to modify it in accordance with the intervention of Fulton County. There is no objection to this intervention and it was stipulated by all parties that the plan as embodied in House Bill 367 should be modified by deleting the descriptions of the 21 separate Fulton County districts as contained in the Bill and substituting in their place and stead the descriptions attached to the Fulton County intervention. Such modification will be granted.

## THE SPECIAL ELECTION

■ The intent of the order of this court dated June 30, 1964, as amended on November 3, 1964, supra, was that any special election to be held for the purpose of filling interim vacancies pursuant to a plan of reapportionment would be conducted as nearly as possible in the manner and mode of the regular election of members of the House of Representatives, and in accordance with the laws appertaining to such elections. House Bill 580, enacted for the purpose of filling the vacancies, appears to depart from the intent of the order in three particulars. The general law provides that party primaries be conducted on the same date while House Bill 580 requires that they be conducted on different dates. The general law provides that parties may nominate by primary or by nominating petition. House Bill 580 requires that parties nominate only by primary. It appeared from evidence adduced on the hearing that these requirements are more onerous than those existing in the general election laws, and to the extent they are given effect the order of the court would be *pro tanto* frustrated. Moreover, it appeared without dispute that the primary and election schedule contemplated by House Bill 580 would not provide sufficient time for members of the electorate to participate under some conditions by absentee ballot. It will therefore be necessary to set aside these conflicting provisions of House Bill 580 so that the special election may be conducted as nearly as possible in accord with the general laws of Georgia on the subject, and they are thus invalidated to that extent.

The court, in order to alleviate any problems thus presented and to make certain that the special election could go forward, directed the intervenors, members of the State Republican Party, to formulate a proposed order on the subject in cooperation with the Attorney General of Georgia. That has been done and it appears that the election is now proposed for June 16, 1965, after being called during the week of April 7, 1965. Qualifications for the primaries or by nominating petition will be by April 21, 1965. Primaries of both parties will be held on May 5, 1965, with primary run-offs on May 19, 1965. This schedule and the particular dates will be left to the discretion of the Governor of Georgia and the political parties so long as the election is not called for a date earlier than June 16, 1965, and provided the time is adequate for participation by absentee voters, the party primaries are held on the same date as is now the case in the general election laws, and provided the parties may nominate by nominating petition in the manner permitted under the general election laws.

## THE PETITION OF THE HOUSE OF REPRESENTATIVES FOR RELIEF FROM THE PRIOR ORDER OF THE COURT

■ The petition of the House of Representatives to modify our prior order so as to allow the present members of the House to serve the additional year of their term, that is to say for the year 1966, is denied. The petition as to those representatives designated in the petition as being in Class 1, which class consists of legislative districts embracing one county only and in which neither the geographical area nor the number of representatives is in any way changed, will be granted and our prior order of June 30, 1964, as amended on November 3, 1964, will be modified to that extent. The members of this class, said to consist of sixty-four representatives in forty-seven districts, may serve out their present terms as set by Art. III, § IV, Par. 1 of the State Constitution (Code § 2–1601) in the House of Representatives without standing for re-election in the aforesaid special election.

■ The petition to modify the order so as to include Classes 2, 3, and 4 is denied. In each of these classes, either the number of representatives in a particular county or district has been increased by designating the seats held by the present representatives as floterial, (Class 2); or by adding additional seats

to the district, (Class 3); or by combining counties into separate districts so as to retain the present number of seats in the combined geographical area. In the case of these Classes, 2, 3, and 4, it is the opinion of the court that its prior order contemplated that the electorate in the districts involved should have the opportunity of filling the present seats at the same time the additional seats are filled.

## ORDER

The premises considered, it is decreed, ordered, and adjudged as follows:

### 1.

The present plan of Senate apportionment in Georgia and the proposed plan of apportionment for the House of Representatives, separately and collectively, fall short of the mandate of the equal protection clause of the Fourteenth Amendment as construed by the Supreme Court in Reynolds v. Sims and related cases, supra. The present apportionment of the Senate and the proposed apportionment of the House are approved as interim plans of apportionment for the period ending with the end of the regular session of the General Assembly of Georgia for 1968 or May 1, 1968, whichever date may be earlier; without prejudice however to the right of the General Assembly of Georgia at any earlier date to alter the apportionment in either or both the Senate and House so as to more nearly comply with the subsisting constitutional requirement.

### 2.

The plan for a special election embraced in House Bill 580 to fill the seats created by House Bill 367 in the House of Representatives, which seats will become vacant at the end of 1965 under the order of this court dated June 30, 1964, as amended on November 3, 1964, is modified to eliminate and invalidate the requirement for separate primaries, the requirement that parties may nominate only by primaries, and the dates attendant to the proposed election. As modified, the bill is approved provided the election is not called for a date prior to June 16, 1965.

The defendants, their agents, attorneys, all members of the class represented by defendants, their agents, attorneys and all other persons acting in concert therewith are hereby permanently enjoined from enforcing or otherwise giving effect to House Bill 580 in any contrary manner, and from actions affecting the conduct of the nominations and election in any manner inconsistent with this opinion and order.

### 3.

The motion of the House of Representatives is granted with respect to the representatives holding seats in the class designated in House Resolution No. 313 as Class 1; that is to say, those representatives now holding seats in districts containing only one county under House Bill 367, and to which county is allotted the same number of representatives thereunder as the county comprising the district was allotted under Georgia Code § 47–101 as it existed prior to its being amended by the House Bill 367. The order of this court dated June 30, 1964, as amended on November 3, 1964 is modified to this extent. The petition of the House of Representatives is in all other respects denied.

### 4.

The petition of Fulton County to modify House Bill 367 so as to delete the descriptions of the twenty one separate Fulton County representative districts contained in the Bill and to substitute therefor the descriptions annexed to the petition, which descriptions are made a part of this order by reference, is granted. This modification comports with the practice approved for Alabama in Reynolds v. Sims, supra.

### 5.

The court retains jurisdiction over all matters and questions pending in the case, expressly including but not limited to jurisdiction under this order and the prior order of June 30, 1964, as

amended on November 3, 1964 for the purpose of effectuating the reapportionment of the House of Representatives through the medium of the aforesaid special election.

It is so ordered.

## APPENDIX A

# APPENDIX B

## STATISTICAL SUMMARY OF 1965 APPORTIONMENT OF HOUSE OF REPRESENTATIVES

| DISTRICT NUMBER | COUNTIES | NUMBER OF REPRESENTATIVES | AVERAGE POPULATION PER REPRESENTATIVE | % of variance from Norm | TOTAL POPULATION |
|---|---|---|---|---|---|
| **DISTRICTS OF 12,500 OR LESS** | | | | | |
| 64 | Bulloch | 2 | 12,131 | —37% | 24,263 |
| 68 | Sumter | 2 | 12,326 | —36% | 24,652 |
| | | 4 | | | 48,915 |
| **DISTRICTS OF 12,500 – 13,000** | | | | | |
| 89 | Decatur | 2 | 12,601 | —35% | 25,203 |
| **DISTRICTS OF 13,000 – 13,500** | | | | | |
| 18 | Franklin | 1 | 13,274 | —31% | 13,274 |
| 21 | Paulding | 1 | 13,101 | —32% | 13,101 |
| 41 | Columbia | 1 | 13,423 | —30% | 13,423 |
| 48 | Johnson-Washington | 2 | 13,475 | —30% | 26,951 |
| 74 | Appling | 1 | 13,246 | —31% | 13,246 |
| 86 | Early | 1 | 13,151 | —32% | 13,151 |
| | | 7 | | | 93,146 |

| DISTRICT NUMBER | COUNTIES | NUMBER OF REPRESENTATIVES | AVERAGE POPULATION PER REPRESENTATIVE | % of variance from Norm | TOTAL POPULATION |
|---|---|---|---|---|---|
| DISTRICTS OF 13,500 – 14,000 | | | | | |
| 4 | Fannin | 1 | 13,620 | —29% | 13,620 |
| 5 | Union-Lumpkin | 1 | 13,751 | —29% | 13,751 |
| 57 | Taylor-Marion | 1 | 13,788 | —28% | 13,788 |
| 63 | Candler-Evans | 1 | 13,624 | —29% | 13,624 |
| 61 | Quitman-Randolph | 1 | 13,510 | —30% | 13,510 |
| 72 | Ben Hill | 1 | 13,633 | —29% | 13,633 |
| 87 | Miller-Seminole | 1 | 13,710 | —29% | 13,710 |
| | | 7 | | | 95,636 |
| DISTRICTS OF 14,000 – 14,500 | | | | | |
| 14 | Bartow | 2 | 14,133 | —27% | 28,267 |
| 20 | Polk | 2 | 14,007 | —27% | 28,015 |
| 23 | Barrow | 1 | 14,485 | —25% | 14,485 |
| 30 | Oconee-Oglethorpe | 1 | 14,230 | —26% | 14,230 |
| | | 6 | | | 84,997 |
| DISTRICTS OF 14,500 – 15,000 | | | | | |
| 26 | Haralson | 1 | 14,543 | —24% | 14,543 |
| 46 | Jasper-Jones | 1 | 14,603 | —24% | 14,603 |
| 50 | Burke-Jenkins | 2 | 14,872 | —25% | 29,744 |
| 55 | Screven | 1 | 14,919 | —22% | 14,919 |
| 69 | Crisp-Dooly | 2 | 14,621 | —24% | 29,242 |
| | | 7 | | | 103,051 |

| DISTRICT NUMBER | COUNTIES | NUMBER OF REPRESENTATIVES | AVERAGE POPULATION PER REPRESENTATIVE | % of variance from Norm | TOTAL POPULATION |
|---|---|---|---|---|---|
| DISTRICTS OF 15,000 – 15,500 | | | | | |
| 19 | Hart | 1 | 15,229 | –21% | 15,229 |
| 98 | Charlton-Camden | 1 | 15,288 | –21% | 15,288 |
| 99 | Brooks | 1 | 15,292 | –21% | 15,292 |
| | | 3 | | | 45,809 |
| DISTRICTS OF 15,500 – 16,000 | | | | | |
| 10 | Dawson-Forsyth | 1 | 15,760 | –18% | 15,760 |
| 84 | Pierce-Brantley | 1 | 15,569 | –19% | 15,569 |
| | | 2 | | | 31,329 |
| DISTRICTS OF 16,000 – 16,500 | | | | | |
| 58 | Schley-Macon | 1 | 16,426 | –15% | 16,426 |
| 60 | Laurens | 2 | 16,156 | –16% | 32,313 |
| 65 | Effingham-Bryan | 1 | 16,370 | –15% | 16,370 |
| 70 | Dodge | 1 | 16,483 | –14% | 16,483 |
| 78 | Clay-Calhoun-Baker | 1 | 16,435 | –15% | 16,435 |
| 95 | Lowndes | 3 | 16,423 | –15% | 49,270 |
| | | 9 | | | 147,297 |
| DISTRICTS OF 16,500 – 17,000 | | | | | |
| 16 | Hall | 3 | 16,579 | –14% | 49,739 |
| 27 | Douglas | 1 | 16,741 | –13% | 16,741 |
| 62 | Toombs | 1 | 16,837 | –13% | 16,837 |
| 80 | Worth | 1 | 16,682 | –13% | 16,682 |
| | | 6 | | | 99,999 |

| DISTRICT NUMBER | COUNTIES | NUMBER OF REPRESENTATIVES | AVERAGE POPULATION PER REPRESENTATIVE | % of variance from Norm | TOTAL POPULATION |
|---|---|---|---|---|---|
| **DISTRICTS OF 17,000 – 17,500** | | | | | |
| 33 | Heard-Coweta | 2 | 17,113 | —11% | 34,226 |
| 44 | Pike-Lamar | 1 | 17,378 | —10% | 17,378 |
| 47 | Baldwin | 2 | 17,032 | —12% | 34,064 |
| 49 | Jefferson | 1 | 17,468 | — 9% | 17,468 |
| 53 | Twiggs-Wilkinson | 1 | 17,185 | —11% | 17,185 |
| 61 | Treutlen-Wheeler-Montgomery | 1 | 17,500 | — 9% | 17,500 |
| 83 | Ware | 2 | 17,109 | —11% | 34,219 |
| 91 | Jeff Davis-Bacon | 1 | 17,273 | —10% | 17,273 |
| 92 | Thomas | 2 | 17,159 | —11% | 34,319 |
| 94 | Colquitt | 2 | 17,024 | —12% | 34,048 |
| | | 15 | | | 257,680 |
| **DISTRICTS OF 17,500 – 18,000** | | | | | |
| 1 | Dade-Walker | 3 | 17,976 | — 7% | 53,930 |
| 3 | Whitfield-Murray | 3 | 17,518 | — 9% | 52,556 |
| 9 | Gilmer-Pickens | 1 | 17,825 | — 7% | 17,825 |
| 17 | Banks-Madison | 1 | 17,743 | — 8% | 17,743 |
| 25 | Elbert | 1 | 17,835 | — 7% | 17,835 |
| 34 | Spalding | 2 | 17,702 | — 8% | 35,404 |
| 36 | Henry | 1 | 17,619 | — 8% | 17,619 |
| 39 | Hancock-Putnam | 1 | 17,777 | — 8% | 17,777 |
| 54 | Emanuel | 1 | 17,815 | — 7% | 17,815 |
| 71 | Pulaski-Bleckly | 1 | 17,846 | — 7% | 17,846 |

| DISTRICT NUMBER | COUNTIES | NUMBER OF REPRESENTATIVES | AVERAGE POPULATION PER REPRESENTATIVE | % of variance from Norm | TOTAL POPULATION |
|---|---|---|---|---|---|
| DISTRICTS OF 17,500 – 18,000 Continued | | | | | |
| 77 | Wayne | 1 | 17,921 | — 7% | 17,921 |
| 81 | Turner-Irwin | 1 | 17,650 | — 8% | 17,650 |
| | | 17 | | | 301,921 |
| DISTRICTS OF 18,000 – 18,500 | | | | | |
| 11 | Habersham | 1 | 18,116 | — 6% | 18,116 |
| 12 | Stephens | 1 | 18,391 | — 4% | 18,391 |
| 24 | Jackson | 1 | 18,499 | — 4% | 18,499 |
| 32 | Carroll | 2 | 18,225 | — 5% | 36,451 |
| 35 | Fayette-Clayton | 3 | 18,188 | — 5% | 54,564 |
| 100 | Harris-Talbot | 1 | 18,294 | — 5% | 18,294 |
| 90 | Grady | 1 | 18,105 | — 6% | 18,015 |
| | | 10 | | | 182,330 |
| DISTRICTS OF 18,500 – 19,000 | | | | | |
| 6 | Towns-Rabun-White | 1 | 18,929 | — 2% | 18,929 |
| 67 | Terrell-Lee | 1 | 18,946 | — 2% | 18,946 |
| 79 | Dougherty | 4 | 18,920 | — 2% | 75,680 |
| | | 6 | | | 113,555 |
| DISTRICTS OF 19,000 – 19,500 | | | | | |
| 8 | Gordon | 1 | 19,228 | — 0% | 19,228 |
| 45 | Butts-Monroe | 1 | 19,471 | + 1% | 19,471 |
| | | 2 | | | 38,699 |

| DISTRICT NUMBER | COUNTIES | NUMBER OF REPRESENTATIVES | AVERAGE POPULATION PER REPRESENTATIVE | % of variance from Norm | TOTAL POPULATION |
|---|---|---|---|---|---|
| DISTRICTS OF 19,500 – 20,000 | | | | | |
| 7 | Chattooga | 1 | 19,954 | + 4% | 19,954 |
| 43 | Meriwether | 1 | 19,756 | + 3% | 19,756 |
| 52 | Crawford-Peach | 1 | 19,662 | + 2% | 19,662 |
| 59 | Houston | 2 | 19,577 | + 2% | 39,154 |
| 73 | Wilcox-Telfair | 1 | 19,620 | + 2% | 19,620 |
| 75 | Tattnall-Long | 1 | 19,711 | + 3% | 19,711 |
| 88 | Mitchell | 1 | 19,652 | + 2% | 19,652 |
| 97 | Lanier-Atkinson-Clinch-Echols | 1 | 19,706 | + 2% | 19,706 |
| | | 9 | | | 177,215 |
| DISTRICTS OF 20,000 – 20,500 | | | | | |
| 28 | Walton | 1 | 20,481 | + 7% | 20,481 |
| 31 | Taliaferro-Wilkes-Lincoln | 1 | 20,237 | + 5% | 20,237 |
| | | 2 | | | 40,718 |
| DISTRICTS OF 20,500 – 21,000 | | | | | |
| 113 – 116 | Chatham | 9 | 20,922 | + 9% | 188,299 |
| 76 | Liberty-McIntosh | 1 | 20,851 | + 8% | 20,851 |
| 85 | Glynn | 2 | 20,977 | + 9% | 41,954 |
| 37 | Newton | 1 | 20,991 | + 9% | 20,991 |
| | | 13 | | | 272,095 |

| DISTRICT NUMBER | COUNTIES | NUMBER OF REPRESENTATIVES | AVERAGE POPULATION PER REPRESENTATIVE | % of variance from Norm | TOTAL POPULATION |
|---|---|---|---|---|---|
| DISTRICTS OF 21,000 – 21,500 | | | | | |
| 2 | Catoosa | 1 | 21,101 | +10% | 21,101 |
| 38 | Greene-Morgan | 1 | 21,473 | +12% | 21,473 |
| | | 2 | | | 42,574 |
| DISTRICTS OF 21,500 – 22,000 | | | | | |
| 22 | Gwinnett | 2 | 21,770 | +13% | 43,541 |
| 82 | Coffee | 1 | 21,953 | +14% | 21,953 |
| | | 3 | | | 65,494 |
| DISTRICTS OF 22,000 – 22,500 | | | | | |
| 117 – 4 | DeKalb | 12 | 22,279½ | | 256,782 |
| 118 – 4 | Rockdale | | | | |
| 119 – 4 | | | 10,572 | +16% | 10,572 |
| | | 12 | | | 267,354 |
| DISTRICTS OF 22,500 – 23,000 | | | | | |
| 101 – 103 | Cobb | 5 | 22,831 | +19% | 114,174 |
| 29 | Clarke | 2 | 22,681 | +19% | 45,363 |
| 40 | McDuffie-Glascock-Warren | 1 | 22,659 | +18% | 22,659 |
| 104 – 106 | Richmond | 6 | 22,600 | +18% | 135,601 |
| 110 – 112 | Muscogee | 7 | 22,660 | +18% | 158,623 |
| | | 21 | | | 476,420 |

| DISTRICT NUMBER | COUNTIES | NUMBER OF REPRESENTATIVES | AVERAGE POPULATION PER REPRESENTATIVE | % of variance from Norm | TOTAL POPULATION |
|---|---|---|---|---|---|
| DISTRICTS OF 23,000 – 23,500 | | | | | |
| 13 | Floyd | 3 | 23,043 | +20% | 69,130 |
| 15 | Cherokee | 1 | 23,001 | +20% | 23,001 |
| 56 | Webster-Stewart-Chattahoochee | 1 | 23,629 | +23% | 23,629 |
| 93 | Tift | 1 | 23,487 | +22% | 23,487 |
| 120 – 3<br>121 – 3<br>122 – 3<br>123 – 3<br>124 – 3<br>125 – 3<br>126 – 3<br>127 – 3 | Fulton (21 elected by District – 3 in County at Large) | 24 | 23,180 | +21% | 556,326 |
| | | 30 | | | 695,573 |
| DISTRICTS OF 23,500 – 24,000 | | | | | |
| 42 | Troup | 2 | 23,594 | +23% | 47,189 |
| 51 | Upson | 1 | 23,800 | +24% | 23,800 |
| 107 – 109 | Bibb | 6 | 23,541 | +22% | 141,249 |
| 96 | Berrien-Cooke | 1 | 23,860 | +24% | 23,860 |
| | | 10 | | | 236,098 |