## FORTSON, SECRETARY OF STATE OF GEORGIA
### *v.* MORRIS ET AL.

No. 800.   Argued December 5, 1966.—Decided December 12, 1966.

*Harold N. Hill, Jr.,* Assistant Attorney General of Georgia, argued the cause for appellant. With him on the briefs were *Arthur K. Bolton,* Attorney General, *G. Ernest Tidwell,* Executive Assistant Attorney General, *Coy R. Johnson,* Assistant Attorney General, and *Gerald H. Cohen* and *Alexander Cocalis,* Deputy Assistant Attorneys General.

*Charles Morgan, Jr.,* argued the cause for appellees Morris et al.   With him on the briefs were *Morris Brown*

232

and *Melvin L. Wulf. Emmet J. Bondurant II* argued the cause for appellees Justice et al. With him on the briefs were *Francis Shackelford* and *Randolph W. Thrower.*

MR. JUSTICE BLACK delivered the opinion of the Court.

Since 1824 a provision of the Constitution of the State of Georgia, now Art. V, § I, ¶ IV, has provided that its Governor shall be selected (1) by a majority of votes cast in a general election, and (2) if no candidate receives a majority of votes at such election, then a majority of the members of the Georgia General Assembly shall elect the Governor "from the two persons having the highest number of votes . . . ."[1] At the State's general election, held Tuesday, November 8, 1966, no single candidate received a majority of the votes cast. A Georgia three-judge federal district court has in this case enjoined the State Assembly from electing one of the two highest candidates as Governor on the ground that this method of election, required by Article V of the Georgia Constitution, would deny Georgia voters equal protection of the laws in violation of the Fourteenth Amendment. We

---

[1] Article V, § I, ¶ IV (Ga. Code Ann. § 2–3004). "How returns published.—The members of each branch of the General Assembly shall convene in the Representative Hall, and the President of the Senate and Speaker of the House of Representatives shall open and publish the returns in the presence and under the direction of the General Assembly; and the person having the majority of the whole number of votes, shall be declared duly elected Governor of this State; but, if no person shall have such majority, then from the two persons having the highest number of votes, who shall be in life, and shall not decline an election at the time appointed for the General Assembly to elect, the General Assembly shall immediately, elect a Governor viva voce; and in all cases of election of a Governor by the General Assembly, a majority of the members present shall be necessary to a choice."

uphold the constitutionality of Article V of the State Constitution, for so long as this provision is applied as it is written, we perceive no conflict with the Equal Protection Clause. We reverse the District Court's judgment.

The District Court erroneously relied on *Gray* v. *Sanders*, 372 U. S. 368, to strike down Article V of the State's Constitution. The *Gray* case held that it had been demonstrated that Georgia voters were denied equal protection of the laws by the operation of a county-unit system under which state officials were elected by a majority of counties voting as units instead of by a majority of individual voters. The result was that the number of votes of persons living in large counties was given no more weight in electing state officers than was given to a far fewer number of votes of persons residing in small counties. This discrimination against large county voters was held to deny them the equal protection of the laws. That case, as was emphasized, had to do with the equal right of "all who participate in the election," 372 U. S., at 379, to vote and have their votes counted without impairment or dilution. But as the Court said, 372 U. S., at 378, the case was "only a voting case." Not a word in the Court's opinion indicated that it was intended to compel a State to elect its governors or any other state officers or agents through elections of the people rather than through selections by appointment or elections by the State Assembly. It is wrongly cited as having either expressly or impliedly decided that a State cannot, if it wishes, permit its legislative body to elect its Governor.

The language of Article V of the State Constitution struck down by the District Court has been a part of Georgia's State Constitution since 1824 and was re-adopted by the people in 1945. It set up two ways to

234

select the Governor. The first, and preferred one, was election by a majority of the people; the second, and alternative one, was election by the State Assembly if any one candidate failed to receive a majority of the popular vote. Under the second method, in the legislative election the votes of the people were not to be disregarded but the State Assembly was to consider them as, in effect, nominating votes and to limit itself to choosing between the two persons on whom the people had bestowed the highest number of votes. There is no provision of the United States Constitution or any of its amendments which either expressly or impliedly dictates the method a State must use to select its Governor. A method which would be valid if initially employed is equally valid when employed as an alternative. It would be surprising to conclude that, after a State has already held two primaries and one general election to try to elect by a majority, the United States Constitution compels it to continue to hold elections in a futile effort to obtain a majority for some particular candidate. Statewide elections cost time and money and it is not strange that Georgia's people decided to avoid repeated elections. The method they chose for this purpose was not unique, but was well known and frequently utilized before and since the Revolutionary War. Georgia Governors were selected by the State Legislature, not the people, until 1824. At that time a new constitution provided for popular election, but with the provision that upon the failure of any one candidate to receive a majority, the General Assembly should elect.

Two States, Mississippi and Vermont,[2] that provide for majority voting also provide for state legislative election of their governors in case of no majority in the general election. Thirty-eight States of the Union which today provide for election of their governors by a plurality also

[2] Miss. Const., Art. 5, §§ 140, 141; Vt. Const., c. II, § 39.

provide that in case of a tie vote the State Legislatures shall elect.[3]

It thus turns out that Georgia, clearly acting within its rights as a State, has decided that, any one candidate failing to obtain a majority in a general election, its General Assembly will elect its Governor. Its clear choice has remained in its constitution for 142 years. The District Court below treated Article V of the Georgia Constitution as the valid law of the State except as it thought itself compelled to strike it down because of *Gray* v. *Sanders, supra.* The *Gray* case, however, did no more than to require the State to eliminate the county-unit machinery from its election system. The State did this in an election that resulted in the election of no candidate. Its duty now, under Article V of its Constitution, is to proceed to have the General Assembly elect its Governor from the two highest candidates in the election, unless, as some of the parties contend, the entire legislative body is incapable of performing its responsibility of electing a Governor because it is malapportioned. But this is not correct. In *Toombs* v. *Fortson,* 384 U. S. 210, affirming 241 F. Supp. 65, we held that with certain exceptions, not here material, the Georgia Assembly could continue to function until May 1, 1968. Consequently the Georgia Assembly is not disqualified to elect a Governor as required by Article V of the State's Constitution. Neither is it disqualified by the fact that its Democratic members had obligated themselves to

---

[3] This is by statutory provision in North Carolina and by constitutional provision in Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

support the Democratic nominee in the general election on November 8, 1966. That election is over, and with it terminated any promises by the Democratic legislators to support the Democratic nominee.

Article V of Georgia's Constitution provides a method for selecting the Governor which is as old as the Nation itself. Georgia does not violate the Equal Protection Clause by following this article as it was written.

*Reversed.*

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE, MR. JUSTICE BRENNAN, and MR. JUSTICE FORTAS concur, dissenting.

This is an appeal from a decision of a three-judge district court declaring unconstitutional and enjoining the enforcement of Article V, Section I, Paragraph IV, of the Georgia Constitution which authorizes the election of the Governor of Georgia by the General Assembly when no candidate has received a majority of the total votes cast in the general election.[1]

We are told that in the November 8, 1966, general election for Governor, there were 955,770 votes cast as follows:

Howard H. Callaway........... 449,894 votes or 47.07%
Lester G. Maddox.............. 448,044 votes or 46.88%
Ellis G. Arnall................ 57,832 votes or 6.05%

The Georgia Election Code provides that "[n]o candidate shall be nominated for public office in any primary

---

[1] The Georgia Constitution, Art. V, § I, ¶ IV, provides:

"The members of each branch of the General Assembly shall convene in the Representative Hall, and the President of the Senate and Speaker of the House of Representatives shall open and publish the returns in the presence and under the direction of the General Assembly; and the person having the majority of the whole number of votes, shall be declared duly elected Governor of this State; but, if no person shall have such majority, then from the two persons

or elected to public office in any election unless such candidate shall have received a majority of the votes cast to fill such nomination or public office." Ga. Code Ann. § 34–1514 (Supp. 1965). That law goes on to provide that where no candidate "receives a majority of the votes cast, a runoff primary or election shall be held, between the two candidates receiving the highest number of votes," and the candidate who receives "a majority of the votes cast in such runoff" shall be declared the winner. The Attorney General of Georgia rendered an opinion on October 21, 1966, that the provisions of § 34–1514 were in conflict with the provisions of the Georgia Constitution and that the latter controlled in the event no candidate for Governor received a majority in the general election.

This action for a declaratory judgment was brought by citizens of Georgia residing in counties throughout the State who voted in the November 8, 1966, general election for Governor. They ask for the benefit of a runoff election between the two candidates who received the highest number of votes as provided in § 34–1514 or a special election pursuant to the Georgia Election Code.[2] The District Court held the provision of the Georgia Constitution which placed the election of the Governor in the General Assembly unconstitutional and void.

having the highest number of votes, who shall be in life, and shall not decline an election at the time appointed for the General Assembly to elect, the General Assembly shall immediately, elect a Governor viva voce; and in all cases of election of a Governor by the General Assembly, a majority of the members present shall be necessary to a choice."

[2] Ga. Code Ann. § 34–1515 (Supp. 1965) provides:

"Whenever any primary or election shall fail to fill a particular nomination or office and such failure cannot be cured by a runoff primary or election . . . then the authority, with whom the candidates for such nomination or office filed their notice of candidacy, shall thereupon call a special primary or election to fill such position."

238

262 F. Supp. 93. It issued a stay for a period of 10 days so as to enable the appellant to seek an additional stay here and retained jurisdiction for such other and further proceedings as might be deemed applicable and just. The case is here by appeal which we noted, and we expedited the hearing because of the urgency of the issue presented. *Post*, p. 955.

The Court misstates the question we must decide. It is not whether Georgia may select a Governor through a legislative election.[3] It is whether the legislature may make the final choice when the election has been entrusted to the people and no candidate has received a majority of the votes. In other words, the legislative choice is only a part of the popular election machinery. The 1824 amendment to the 1798 Constitution of Georgia, which gave the legislature power to elect a governor, treated that stage as only one of two in the general election.[4] The first stage, then as now, was an election open to "the persons qualified to vote for members of the general assembly." Ga. Const. 1798, Art. II, § 2, as amended, 1824.

It is said that the general election is over and that a new, and different, alternative procedure is now about to be used. But that is belied by the realities. The primary election selected the party candidates, the choices of the two parties are still in balance, and the legislative choice is restricted to those two candidates. The election, commencing with the primary, will indeed not be finally completed until the winner has taken the oath of office. Up to then the vacancy which occasioned the election has not been filled.

---

[3] Georgia's state auditor is chosen by the legislature. Ga. Code Ann. § 40–1801.

[4] Originally Georgia left the selection of Governor to the legislature, the House selecting three candidates and the Senate choosing one of the three by majority vote. Ga. Const. 1789, Art. II, § 2.

Our starting point is what we said in *Gray* v. *Sanders,* 372 U. S. 368, 379–380:

"Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment. The concept of 'we the people' under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications."

It is argued with earnestness that if the electoral college can be used to select a President, a legislature can be used to select a governor. It is said that there is no more a violation of the "one person, one vote" principle in the one than in the other. But the Twelfth Amendment creates the exception in case of a President. There is no like exception in the choice of a governor.[5]

"The only weighting of votes sanctioned by the Constitution concerns matters of representation, such as the allocation of Senators irrespective of population and the use of the electoral college in the choice of a President. . . . But once the class of

---

[5] "We think the analogies to the electoral college, to districting and redistricting, and to other phases of the problems of representation in state or federal legislatures or conventions are inapposite. The inclusion of the electoral college in the Constitution, as the result of specific historical concerns, validated the collegiate principle despite its inherent numerical inequality, but implied nothing about the use of an analogous system by a State in a statewide election. No such specific accommodation of the latter was ever undertaken, and therefore no validation of its numerical inequality ensued." *Gray* v. *Sanders,* 372 U. S. 368, 378.

voters is chosen and their qualifications specified, we see no constitutional way by which equality of voting power may be evaded. . . .

. . . . .

"The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing— one person, one vote." *Gray* v. *Sanders, supra,* at 380–381.

If the legislature is used to determine the outcome of a general election, the votes cast in that election would be weighted, contrary to the principle of "one person, one vote." All the vices we found inherent in the county unit system in *Gray* v. *Sanders* are inherent when the choice is left to the legislature. A legislator when voting for governor has only a single vote. Even if he followed the majority vote of his constituency, he would necessarily disregard the votes of those who voted for the other candidate, whether their votes almost carried the day or were way in the minority.[6] He would not be under a mandate to follow the majority or plurality votes in his constituency, but might cast his single vote on the side of the minority in his district. Even if he voted for the candidate receiving a plurality of votes cast in his district and even if each Senator and Representative followed the same course, a candidate who received a minority of the popular vote might receive a

---

[6] In *Gray* v. *Sanders, supra,* in speaking of this same vice in the county unit system we said:

". . . if a candidate won 6,000 of 10,000 votes in a particular county, he would get the entire unit vote, the 4,000 other votes for a different candidate being worth nothing and being counted only for the purpose of being discarded." 372 U. S., at 381, n. 12.

clear majority of the votes cast in the legislature. As stated by the District Court:

> "The Georgia election system in the constitutional provision now under consideration permits unequal treatment of the voters within the class of voters selected, and it thus cannot stand. Many arguments may be made, but we need go no further than to point out, as stated, that the candidate receiving the lesser number of votes may be elected by the General Assembly. This would give greater weight to the votes of those citizens who voted for this candidate and necessarily dilute the votes of those citizens who cast their ballots for the candidate receiving the greater number of votes. The will of the greater number may be ignored." 262 F. Supp., at 95.

I have said enough to indicate why the substitution of the Georgia Legislature for a runoff vote is an unconstitutional weighting of votes, having all the vices of the county unit system that we invalidated in *Gray v. Sanders*.

What is approved today can, moreover, be the instrument to perpetuate a "one party" system in like derogation of the principle of "one person, one vote." The pledge that every Democratic member of the Georgia Legislature took provides in part: "I further pledge myself to support at the General Election of November 8, 1966, all candidates nominated by the Democratic Party of the State of Georgia." That election has not been completed. We are, as I have said, in the second stage of it. The Democrats control 183 seats [7] in a 205-member House and 46 seats in a 54-member Senate. We

---

[7] This figure does not take into account a runoff election held on November 22, 1966, to fill a House seat.

would be less than naive to believe that the momentum of that oath has now been dissipated and that the predominantly Democratic legislature has now become neutral.

The fact that this constitutional provision allowing the legislature to choose the Governor was adopted by the people of Georgia is "without federal constitutional significance, if the scheme adopted fails to satisfy the basic requirements of the Equal Protection Clause, as delineated in our opinion in *Reynolds* v. *Sims*." See *Lucas* v. *Colorado General Assembly*, 377 U. S. 713, 737. We dealt there with an apportionment plan that had been adopted by a popular referendum. We repeat what we said: "A citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be." *Id.*, 736–737.

I would affirm the judgment of the three-judge court and remand the cause for the fashioning of an appropriate decree for a runoff election in which the people's choice will be determined.

Mr. Justice Fortas, with whom The Chief Justice and Mr. Justice Douglas join, dissenting.

I join the opinion of my Brother Douglas, but I add the following:

The specific question before us is the validity of the Georgia constitutional provision which, after vesting in the people "full and complete power to elect a Governor," [1] provides that if no candidate receives a majority, the legislature shall select the winner from the two candidates receiving the highest popular vote. The legislature may select the candidate who received fewer popu-

---

[1] *Thompson* v. *Talmadge*, 201 Ga. 867, 880, 41 S. E. 2d 883, 895 (1947). *Thompson* invalidated selection of a Governor by the legislature when the candidate who received a majority of the votes cast died before taking office.

lar votes than his rival. In my opinion, this scheme is forbidden by the Equal Protection Clause of the Fourteenth Amendment as construed by this Court.

1. *Gray* v. *Sanders,* 372 U. S. 368 (1963), related to Georgia primary elections to nominate candidates for statewide office, including Governor. It held that where the vote cast by each citizen does not have full and equal effect as a result of operation of the county unit system, the Equal Protection Clause is violated. If the Constitution of Georgia incorporated the county unit system as part of the mechanics for election of Governor, I assume there would be no doubt that *Gray* v. *Sanders* would invalidate the provision. Unless the Court is overruling *Gray* v. *Sanders,* it presumably would not validate a Georgia constitutional provision which said that if a majority of the votes are not cast for one candidate, they will be recomputed on a county unit basis which is not proportionate to the voting population, and the result of that recomputation would determine the winner. It is no less a denial of equal protection of the laws for the result of an election to be determined, not by the voters, but by the legislature on a basis which is not related to the votes cast. No less than the county unit system, this means that the vote cast by a citizen is subject to nullification by the legislature. The integrity of the vote is undermined and destroyed by any scheme which can result in the selection of a person as Governor who receives the lesser number of popular votes. If the voting right is to mean anything, it certainly must be protected against the possibility that victory will go to the loser.

2. It distorts reality to say, as the majority here do, that this election is to be scrubbed and ignored, and to proceed as if we were dealing with a situation in which Georgia's Constitution merely provided for the selection of a Governor by the legislature. That is *not* the case.

If it were the intent of the Constitution to scrub the popular election and to cause selection by the legislature as an independent process, the legislature would not be bound to select from the two who received at the polls the highest number of votes. The legislature would be given free choice. As my Brother DOUGLAS' opinion shows, the Constitution attempts something quite different. It purports to give the legislature power to complete the process begun at the polls—to cast aside the vote of the electorate and award the office to the winner or the loser of the popular election, as it may see fit. The analogy to *Gray* v. *Sanders* is clear. This is just as if, for example, the voters expressed their preferences at the polls, and then the winner was selected not on the basis of receiving most votes, but on the basis of selection by officials of the counties concerned.[2]

3. The Georgia Legislature is concededly malapportioned, and is under a federal court order to reapportion itself. *Toombs* v. *Fortson,* 384 U. S. 210 (1966), affirming 241 F. Supp. 65 (D. C. N. D. Ga. 1965). See also *Fortson* v. *Toombs,* 379 U. S. 621 (1965). A majority of the legislators in Georgia's legislature may represent a minority of the voters. But the Court today concludes that despite the fact that it has branded the legislature as apportioned in violation of the Constitution of the United States, it may nevertheless select the Governor. The Court states as its reason for disregarding this that "In *Toombs* v. *Fortson* . . . we held that with certain exceptions, not here material, the Georgia Assembly

---

[2] This would resemble the presidential electoral college system. *Gray* v. *Sanders* expressly states that while this system is beyond judicial reach because it is specifically incorporated in the Federal Constitution, it does not indicate the constitutionality of analogous state schemes. 372 U. S., at 378. See also *Reynolds* v. *Sims,* 377 U. S. 533, 572–577 (1964).

could continue to function until May 1, 1968." This is indeed a weak reed for so monumental a conclusion. The use of a malapportioned legislature to select a Governor is to perpetuate the electoral vices which this Court decreed that the Equal Protection Clause of the Fourteenth Amendment forbade a State to incorporate in its election procedures. *Reynolds* v. *Sims,* 377 U. S. 533 (1964); *Gray* v. *Sanders, supra.* We have declined to deprive a malapportioned legislature of its *de facto* status as a legislature. But not until today has this Court allowed a malapportioned legislature to be the device for doing indirectly what a State may not do directly. If this Court had foreseen that events would place the Georgia Legislature in a position to override the vote of a plurality of the voters and to select as Governor of the State the loser at the polls, I expect that it would have included this power as one of the "exceptions," forbidden to this legislature which, this Court has held, functions only by judicial sufferance despite its constitutional infirmity. To a reader of *Gray* v. *Sanders, Fortson* v. *Toombs,* and *Toombs* v. *Fortson,* it must seem inconceivable that the Court would permit this malapportioned legislature to select Georgia's Governor in these circumstances. Indeed, the irony of the matter is that a three-judge federal court held that the Georgia Legislature was so malapportioned that it could not properly submit to the voters a new Constitution, adopted by both houses of the Georgia Legislature, which would have abolished the provisions for legislative selection of a Governor and have substituted a runoff or special election. See *Fortson* v. *Toombs, supra.* On appeal, this Court, *per curiam,* declined to rule that the District Court's decree was unlawful, but because it was represented that the decree might be moot, the Court remanded for reconsideration in light of the circumstances

which allegedly made the decree no longer pertinent. *Fortson, supra.* But now the Court holds that this same unreformed legislature is not so malapportioned that it cannot itself select the Governor by its direct action! I confess total inability to understand how the two rulings can be reconciled.

4. In denying the applicability of *Gray* v. *Sanders,* the Court says that it was "only a voting case" and that it has nothing to do with a State's decision that the voters will be ousted from their functions, the votes cast by them nullified, and the legislature authorized to select the candidate that most of the electorate repudiated. I respectfully submit that this, too, is "a voting case." It is no less a voting case because it deals with a state mechanism for *total* disregard of the principle of one man, one vote. It is no less a voting case because it deals with the election of the Governor rather than his nomination as in *Gray* v. *Sanders.* I should assume—diffidently in view of today's startling result—that this Court would not rule that the Federal Constitution would tolerate a state constitutional provision that would enable the Governor to appoint the legislature—or to appoint any legislators for election districts if no candidate received a majority of the votes—or two-thirds—or three-fourths. But there is no difference in principle between this and the result sanctioned today. If a State can validly provide that the result at the polls can be disregarded and the outcome removed from democratic processes where no candidate for Governor receives a majority, there is no reason why the same rule cannot be applied to legislators. Moreover, the Court today announces in an offhand manner, as a side effect of today's decision, without adequate argument or consideration, that a State may today, as some States did long ago, provide that its Governor shall be selected by its legislature in total disregard of the

voters.   I do not believe that the issue is so easy.   Much water has gone under the bridge since the late 1700's and the early 1800's.   Our understanding and conception of the rights guaranteed to the people by the "stately admonitions" [3] of the Fourteenth Amendment have deepened, and have resulted in a series of decisions,[4] enriching the quality of our democracy, which certainly do not codify State's rights, governmental theories or conceptions of human liberties as they existed in 1824, the date when Georgia adopted its present system of choosing a Governor.   I have no doubt, for example, that in the early days of the Nation many of the state legislatures were malapportioned.   See *Reynolds* v. *Sims, supra,* at 573, n. 53, and 602–607 (dissent).   But this did not enshrine that condition forever beyond the reach of constitutional prohibition.   Certainly, the antiquity of the practice did not cause this Court to refrain from invalidating malapportionment under the Equal Protection Clause.   As Mr. Justice Holmes said long ago,

"[W]hen we are dealing with words that also are a constituent act, like the Constitution of the United States, we must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters.   It was enough for them to realize or to hope that they had created an organism; it has taken a century and has cost their successors much sweat and blood to prove that they created a nation.   The case before us must be considered in the light of our

---

[3] Learned Hand, Spirit of Liberty 163 (1960).

[4] See, *e. g., Baker* v. *Carr,* 369 U. S. 186 (1962); *Gray* v. *Sanders, supra; Wesberry* v. *Sanders,* 376 U. S. 1 (1964); *Reynolds* v. *Sims,* 377 U. S. 533 (1964); *Harper* v. *Virginia Bd. of Elections,* 383 U. S. 663 (1966).

whole experience and not merely in that of what was said a hundred years ago." *Missouri* v. *Holland,* 252 U. S. 416, 433 (1920).[5]

5. I do not believe that this Court is the sole custodian of the Constitution, or of the democratic liberties of the people. The power and the responsibility rest also with

---

[5] Only last Term, the Court held in *Harper* v. *Virginia Bd. of Elections,* 383 U. S. 663 (1966), that the right to vote in state elections cannot be burdened or conditioned by a poll tax. We observed:

"We agree, of course, with Mr. Justice Holmes that the Due Process Clause of the Fourteenth Amendment 'does not enact Mr. Herbert Spencer's Social Statics' (*Lochner* v. *New York,* 198 U. S. 45, 75). Likewise, the Equal Protection Clause is not shackled to the political theory of a particular era. In determining what lines are unconstitutionally discriminatory, we have never been confined to historic notions of equality, any more than we have restricted due process to a fixed catalogue of what was at a given time deemed to be the limits of fundamental rights. See *Malloy* v. *Hogan,* 378 U. S. 1, 5–6. Notions of what constitutes equal treatment for purposes of the Equal Protection Clause *do* change." 383 U. S., at 669.

See also the classic statement by Mr. Justice Brandeis, in his dissent in *Olmstead* v. *United States,* 277 U. S. 438, 472 (1928):

" 'We must never forget,' said Mr. Chief Justice Marshall in *McCulloch* v. *Maryland,* 4 Wheat. 316, 407, 'that it is a constitution we are expounding.' Since then, this Court has repeatedly sustained the exercise of power by Congress, under various clauses of that instrument, over objects of which the Fathers could not have dreamed. . . . We have likewise held that general limitations on the powers of Government, like those embodied in the due process clauses of the Fifth and Fourteenth Amendments, do not forbid the United States or the States from meeting modern conditions by regulations which 'a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive.' *Village of Euclid* v. *Ambler Realty Co.,* 272 U. S. 365, 387; *Buck* v. *Bell,* 274 U. S. 200. Clauses guaranteeing to the individual protection against specific abuses of power, must have a similar capacity of adaptation to a changing world."

See also *Weems* v. *United States,* 217 U. S. 349, 373 (1910).

the States, the people, and with lower courts, including the courageous District Court that in the present case insisted upon following this Court's decision in *Gray* v. *Sanders*. But if the people of Georgia—or Maine or California or New York, for that matter—should adopt a constitutional amendment to provide for election of their Governor by the legislature—or for selection of the upper house of their legislature by their Governor, for example—I do not believe that the constitutionality of these measures could be cavalierly assumed. Perhaps this Court's voting rights cases could not so easily be nullified. Their meaning and thrust are perhaps deeper than the mechanics of the tally. They are, one may hope, not merely much ado about form. They represent, one has been led to believe, an acknowledgment that the republican form of government guaranteed by the Constitution, read in light of the General Welfare Clause, the guaranties of equal protection of the laws and the privileges and immunities of citizens of the United States, requires something more than an adherence to form. This Court's apportionment and voting rights decisions soundly reflect a deepening conception, in keeping with the development of our social, ethical, and religious understanding, of the meaning of our great constitutional guaranties. As such, they have reinvigorated our national political life at its roots so that it may continue its growth to realization of the full stature of our constitutional ideal. Today's decision is a startling reversal; a belittling, I say with all respect, of our Constitution's dynamic provisions with respect to the basic instrument of democracy—the vote.

6. The Court brushes off *Gray* v. *Sanders* by saying that it has to do only with the "equal right" of all voters "to vote and have their votes counted without impairment or dilution." That is so. But that is precisely the issue in the present case. We have not heretofore been

so beguiled by changes in the scenery that we have lost sight of principle. See *Terry* v. *Adams,* 345 U. S. 461, esp. 465, n. 1 (1953); *Smith* v. *Allwright,* 321 U. S. 649, 661 (1944). See also *Wesberry* v. *Sanders,* 376 U. S. 1, 17 (1964). Here, too, we are dealing at least with the "impairment" of the vote—indeed, with the obliteration of its effect. It is not merely the casting of the vote or its mechanical counting that is protected by the Constitution. It is the function—the office—the effect given to the vote, that is protected.

A vote is not an object of art. It is the sacred and most important instrument of democracy and of freedom. In simple terms, the vote is meaningless—it no longer serves the purpose of the democratic society—unless it, taken in the aggregate with the votes of other citizens, results in effecting the will of those citizens provided that they are more numerous than those of differing views. That is the meaning and effect of the great constitutional decisions of this Court.

In short, we must be vigilant to see that our Constitution protects not just the right to cast a vote, but the right to have a vote fully serve its purpose. If the vote cast by all of those who favor a particular candidate exceeds the number cast in favor of a rival, the result is constitutionally protected as a matter of equal protection of the laws from nullification except by the voters themselves. The candidate receiving more votes than any other must receive the office unless he is disqualified on some constitutionally permissible basis or unless, in a runoff or some other type of election, the *people* properly and regularly, by their votes, decide differently. "The right to vote is too important in our free society to be stripped of judicial protection"[6] by any other interpretation of our Constitution.

---

[6] *Wesberry* v. *Sanders, supra,* at 7.

In essence, *Gray* v. *Sanders* held that the Equal Protection Clause is violated when persons are elected to statewide office on a basis other than their receiving more votes than their rivals. In my opinion, this principle is exactly applicable here.

It is with the greatest regret that I conclude that today's decision reflects a retreat from constitutional principles so soundly and so proudly developed to apply the Constitution's magnificent admonitions to the deepening moral and human principles of our time. I would affirm the District Court.