R. Reginald PATTERSON, Plaintiff,

v.

John A. BURNS, Defendant.

Civ. No. 70-3276.

United States District Court,
D. Hawaii.

April 28, 1971.

Peter G. Wheelon, Anthony, Waddoups, Hoddick & Brown, Honolulu, Hawaii, for plaintiff.

Bertram T. Kanbara, Atty. Gen., State of Hawaii, Roy M. Miyamoto, Deputy Atty. Gen., Honolulu, Hawaii, for defendant.

Before ELY, Circuit Judge, and PENCE and TAVARES, District Judges.

## DECISION

PER CURIAM.

Plaintiff in this action is a resident and voter of the Fourth Senatorial District in the State of Hawaii. He asks that this court permanently enjoin John A. Burns, the Governor of Hawaii, from appointing a senator to fill the vacancy in the state senate resulting from the death of Larry N. Kuriyama, a nominee for a Fourth District senate seat, just prior to the general election of 1970. Under the decision of the Supreme Court of Hawaii in State ex rel. Karbara v. Gill, 477 P.2d 625 (1970), such an appointment would create a term of office lasting until the general election in November, 1974. Plaintiff further requests that this court order a special election to fill the Fourth District vacancy.

For the reasons set out below, this court finds that Hawaii's legislative and constitutional scheme for filling vacancies in the state senate created by the death of a nominee under the most unusual political situation here involved, created an irrational classification and is therefore contrary to the Equal Pro-

tection Clause of the United States Constitution. We do not, however, order a special election as prayed for. Rather, we order that the state through its Governor and legislature, provide for the filling of the senatorial vacancy in question in a manner not inconsistent with our opinion.

## I.

The Constitution of Hawaii provides that the Fourth Senatorial District is entitled to four state senators.[1] Larry N. Kuriyama, two other incumbents, and a fourth office-seeker, filed as the only candidates for the Democratic senate nominations to the Sixth State Legislature from the Fourth District. No persons filed as candidates for the Republican nominations. At the primary election held on October 3, 1970, the four Democratic candidates won nomination for their district's senatorial seats.

Senator Kuriyama died on October 23, 1970. His term of office in the Fifth State Legislature was not to expire until November 3, 1970. His death thus created a vacancy in the senate from the Fourth District, as well as the vacancy in a candidacy for the Sixth Legislature which is the subject of the present suit.

Section 11–118 of the Hawaii Revised Statutes[2] provides that no substitution in candidacy for a state election is to be made within ten days of an election unless the state's chief election official, i. e., the lieutenant governor,[3] determines that the substituted name can be placed on the ballot in a practical and effective manner. Upon Kuriyama's death, the lieutenant governor determined that this was not possible, and the candidacy was declared vacant. Thus at the general election on November 3, 1970, only three senators were elected from the Fourth District.

On November 4, 1970, the state attorney general issued AG Opinion No. 70–

26 advising that under Hawaii law, notably section 17–3 of the H.R.S., as amended, 1970, the vacancy was to be filled at the 1972 general election, pending which the governor could make a temporary, interim appointment.

The lieutenant governor disagreed with the opinion of the attorney general and, in his capacity as supervisor of elections, on November 5, 1970, issued a proclamation for a special election to be held on January 9, 1971, in the Fourth District, the election winner to serve until the date of the 1974 general election.

To resolve this conflict within its own ranks, the state, on the relation of the attorney general, brought an original action against the lieutenant governor in the state supreme court[4] on November 11, 1970, seeking to enjoin the holding of the special election and requesting declaratory relief. Although constitutional issues were set out in the parties' agreed submission to the supreme court, the case was briefed, argued, and decided solely on the procedural question of the applicability of Hawaii's statutes and constitution to the filling of the Fourth District senatorial vacancy.

The supreme court concluded that Article III, Section 6, of the State Constitution governed the case, which provides:

"Any vacancy in the legislature shall be filled for the unexpired term in such a manner as may be prescribed by law, or, if no provision be made by law, by appointment by the governor for the unexpired term."

Finding that neither § 17–3 nor any other legislative act was applicable to the filling of the Fourth District vacancy, the supreme court held that the vacancy could be filled only by appointment by the governor for the remaining portion of the full senatorial term, i. e., until November, 1974.

---

1. Hawaii Const., art. XVI, sec. 1A.

2. As amended, 1970.

3. Hawaii Rev.Stat., sec. 11–2, as amended (1970).

4. Hawaii Rev.Stat., ch. 631 (1968).

On December 4, 1970, R. Reginald Patterson, a resident of the Fourth Senatorial District and a qualified voter for the Hawaii general election held on November 3, 1970, brought suit in federal court against the governor of Hawaii. Patterson alleged that a gubernatorial appointment to fill the Fourth District vacancy would deprive him of his constitutional right to vote for his state representative and asked that a three-judge district court be convened.

On December 4, 1970, U. S. District Court Judge C. Nils Tavares issued a temporary restraining order enjoining the governor from appointing a senator to fill the Fourth District vacancy.[5] After briefs were filed by the parties and argument heard on December 14 and 15, 1970, Judge Tavares concluded that a statutory three-judge court was required to resolve the issues raised by the pleadings. Thereafter this court was convened.

The parties thereafter filed additional memoranda and on January 4, 1971, argued before this court.

## II.

Although the Hawaii supreme court has rendered a decision on one aspect of the present case (the propriety of gubernatorial appointment under state law), neither abstention nor res judicata preclude determination by this court of the constitutional issues raised by plaintiff.

As to abstention, the decision of the Hawaii supreme court in State v. Gill falls far short of the standards for abstention enumerated in England v. La. State Board of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).[6] Although constitutional issues were raised in the agreed submission in Gill,[7] these issues were neither briefed, argued, nor resolved in that case. The parties in their presentation, and the state court in its decision, reached only the procedural question of the propriety of gubernatorial appointment under Hawaii's statutes and constitution.[8]

Although it would superficially appear that traditional res judicata principles[9] might act as a bar to this court's deter-

---

5. The T.R.O. has remained in effect up to the filing of this decision.

6. In England, appellants had first brought suit in federal district court but were remitted to state court for a determination under state law whether the statute they attacked was applicable to them. The Supreme Court in England stated that under Government Employees v. Windsor, 353 U.S. 364, 77 S.Ct. 838, 1 L.Ed.2d 894 (1957), a party must inform the state courts of federal claims so that the state statute in question can be construed "in light of" those claims. By so doing, a party does not waive his right to have his federal claims litigated and decided in federal court. The present case poses not even this minor bar to litigation before a federal court; the state supreme court was either unaware of or oblivious to any federal constitutional issues involved in State v. Gill.

7. Submission of Case Upon Agreed Statement of Facts, State of Hawaii v. Gill, Hawaii Sup.Ct., 477 P.2d 625 (1970) provides at page 9:
   "Respondent further contends that to deny the voters of the Fourth Sena-

torial District an opportunity to elect a candidate for the vacancy would deprive them of rights granted by the Equal Protection clauses of the Federal and State Constitutions, would be in violation of rights granted to them by Article I, Section 6 of the State Constitution and would be contrary to the express provisions of Article III, Section 2 of the State Constitution."

8. The Hawaii Supreme Court's decision removes from consideration by this court a traditional ground for abstention: remittal to a state court for authoritative interpretation of the statute in question. See England v. Board of Medical Examiners, supra, p. 748.

9. See Berman v. Denver Tramway Corp., 197 F.2d 946 (10 Cir. 1952); City of New Port Richey v. O'Malley, 145 So.2d 903 (D.Ct.App.Fla.1962); Price v. Sixth District Agricultural Assn., 201 Cal. 502, 258 P. 387 (1927); People v. ex rel Chilcoat v. Harrison, 253 Ill. 625, 97 N.E. 1092 (1912); State ex rel. Davis v. Willis, 19 N.D. 209, 124 N.W. 706 (1910).

mination of plaintiff's constitutional claims—i. e., that parties are barred from raising for the first time issues which *could* have been raised in a previous suit on the same cause of action [10]— this court finds that the present action is not so barred by the decision of the Hawaii supreme court in State v. Gill. There is a fatal lack of party identity or privity between Patterson and Gill and the possible bar of res judicata fails.

We recognize that, ordinarily, judgment for or against a governmental body is binding on all citizens and residents with respect to matters of a general or public nature.[11]

"* * * [C]itizens and residents, to the extent they are in privity with or represented by the city or state, are bound by judgments against the governmental body [citations omitted]. If it appears that a particular party, although not before the court in person, is so far represented by others that his interest received actual and efficient protection, the decree will be held to be binding on him." Rynsburger v. Dairymen's Fertilizer Co-op., Inc., 266 Cal.App.2d 269, 72 Cal.Rptr. 102, 107 (Ct.App.1968).

In State v. Gill, the lieutenant governor, as supervisor of elections, was concerned lest the state fail to follow his interpretation of the procedures for filling legislative vacancies under the state's election laws. As supervisor of elections he did but act on behalf of all the people's interest in the regularity of elections, and the case was so structured before the state court. Hence res judicata, were it otherwise applicable to the present suit, does not foreclose Patterson from a determination of his constitutional claims before this court.

Under the circumstances of this case, it would be unjust to hold the voters of the Fourth District bound by a decision in which their specific interest was neither championed nor resolved. This court therefore now proceeds to the merits of this case.

### III.

As the Supreme Court noted in Harper v. Virginia Bd. of Elections, 383 U.S. 663, 665, 86 S.Ct. 1079, 1080, 16 L.Ed.2d 169 (1966):

"While the right to vote in federal elections is conferred by Art. I, § 2, of the Constitution [citations omitted], the right to vote in state elections is nowhere expressly mentioned."

It is not necessary for the resolution of this case to identify the precise constitutional origin of the right to vote in state legislative elections,[12] or to determine whether such a right in fact exists.[13] We deal here, as the Supreme Court did in *Harper*, with a case in which the franchise has already been granted to the electorate.[14] Our inquiry is directed toward the rules promulgated by the state in regulating the operation of the franchise, for "once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." [15]

Plaintiff urges that his district would effectively be malapportioned were the governor permitted to appoint a senator to fill the vacancy in the Fourth District. While the court finds this argument to be without merit, this court does, however, find for plaintiff upon an alternative equal protection ground, namely,

---

10. *E. g.*, 46 Am.Jur.2d Judgments sec. 417 (1969).

11. *E. g.*, 50 C.J.S. Judgments § 796b (1947).

12. The right to vote in state elections may be implicit in the constitutional guarantee of due process; at least with respect to the election of state legislators, the right to vote may derive from the First Amend-

ment or possibly from the "republican form of government" clause of the Federal Constitution.

13. See Pope v. Williams, 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817 (1904).

14. Hawaii Const., art. III, sec. 5.

15. Harper v. Virginia Bd. of Elections, 383 U.S. 663, 665, 86 S.Ct. 1079, 1081, 16 L.Ed.2d 169 (1966).

irrational classification, a ground not raised by plaintiff himself.[16]

## A. Malapportionment

█ In a sweeping series of decisions over the past decade the Supreme Court has consistently held that the states are constitutionally required to accord equal weight to citizens' votes in elections.[17] The maxim of "one person, one vote" has been applied with vigor to a wide class of election situations.[18]

█ Plaintiff seeks to apply to the peculiar facts involved here, by analogy, the requirements of equality delineated by the Supreme Court in those apportionment cases, and, in effect, posits the following syllogism: (1) The Fourth District is entitled to four elected senators pursuant to a legislative apportionment scheme whose constitutionality anent the "one man-one vote" principle has been established; (2) if the governor is permitted to appoint a senator to fill the current vacancy from the Fourth District, the voters of that district will in effect have only three elected senators; (3) therefore such action by the governor would result in the unequal apportionment of voting power in the state, contrary to the equal protection clause of the Constitution and the pronouncements of the Supreme Court.

Plaintiff's argument fails both in its intrinsic logic and in its reliance upon the reapportionment decisions of the Supreme Court. These cases recognized that the state can within limits specify the qualifications of voters in both federal and state elections.[19] Article I, § 2, of the Constitution of the United States in fact provides that voters' qualifications rest on state laws, even in federal elections.[20] Citizenship, age, literacy and residency restrictions on the right to vote are constitutionally permissible.[21]

16. See Williams v. Rhodes, 393 U.S. 23, 42 n. 1, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (Harlan, J. concurring). The only mention of the alternative ground of irrational classification was made by Judge Tavares during oral argument. Transcript of Proceedings, Jan. 4, 1971, at p. 29, Patterson v. Burns, Civ. No. 70–3276, D. Hawaii, Dec. 4, 1970.

17. E. g., Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).

18. E. g., Reynolds v. Sims, supra n. 17 (state legislature); Gray v. Sanders, supra n. 17 (governor); Wesberry v. Sanders, supra n. 17 (U.S. Congress); Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968) (county commissioner); Hadley v. Junior College District, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970) (junior college district).

19. See e. g., Hadley v. Junior College District, supra n. 18 at 58–59, 90 S.Ct. 791.

20. Members of the House of Representatives are to be "chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature."

21. See, e. g., Lassiter v. Northampton Election Board, 360 U.S. 45, 50, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959) (literacy); Pope v. Williams, 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817 (1904) (residence).

The power of the states to make such restrictions on the right to vote derives from the Tenth Amendment of the United States Constitution:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

See also Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970).

Although not specifically mentioned in the Supreme Court's decision, it would appear that the Tenth Amendment is the basis of the reasoning employed in Fortson v. Morris, 385 U.S. 231, 87 S.Ct. 446, 17 L.Ed.2d 330 (1966). In Fortson, the Supreme Court upheld the Georgia procedure whereby the state legislature selects a governor from the two candidates with the highest number of votes in a general election where no gubernatorial candidate has received a majority vote. Although Fortson bears some resemblance to the present case that decision is a dubious precedent for resolution of the issues involved here.

There are, however, limits upon the states' power to regulate elections. The equal protection clause as well as other guarantees provided by the United States Constitution are not to be transgressed.[22] Thus, where a comprehensive scheme of legislative apportionment creates a broad and continuing disparity in the voting power of masses of voters, the Supreme Court has found a denial of equal protection.[23] But this is not to say that every disparity in voting power resulting from the operation of a state's election laws constitutes an abuse of the state's power to regulate elections and results in a constitutionally cognizable denial of equal protection. The Supreme Court has itself pointed out that mathematical exactitude is not required in a state's apportionment formula,[24] and it is a well-recognized principle of equal protection doctrine that *every* law creates inequalities of some degree, not all of which rise to constitutional dimension.[25]

Admittedly once the gubernatorial appointment were made, the voters in the Fourth District would stand in a different posture than the rest of the voters of the state. The "inequality" they would suffer, however, would not be the result of a comprehensive, calculated legislative scheme affecting the entire electorate.

If the broad wording of *Fortson* is accepted, state legislatures are empowered to select their state's governor. It does not necessarily follow, however, that a governor may appoint all or some of his state's legislators. Historical and constitutional considerations—inter alia, the guarantee to the states of a republican form of government—militate against a facile inversion of the *Fortson* holding. The Supreme Court has itself in a later case indicated that officers of legislative character may not be appointed outright. *Cf.* Sailors v. Board of Education, 387 U.S. 105, 108, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967).

*Fortson* is distinguishable from the present case on a further ground. The people of Georgia had played at least an indirect role in the selection of their governor by determining which of the gubernatorial candidates were available for selection by the legislature. There is no such run-off feature to the present case.

Moreover, this court's analytic approach differs from that of the Supreme Court in *Fortson*. We recognize the "inequality" wrought by Hawaii's statutory scheme for filling legislative vacancies but do not believe it to be of constitutionally cognizable proportion, either in terms of apportionment of voting power or in terms of irrational classification. On the latter point see text accompanying notes 29 to 33 *infra*. The Court in *Fortson* found inapposite an equal protection argument based on Gray v. Sanders, *supra* n. 17, in which the Georgia county-unit system for electing its governor was invalidated. Holding that *Gray* was "only a voting case," the Court declared that "[n]ot a word in the [*Gray*] Court's opinion indicated that it was intended to compel a State to elect its governors or any other state officers or agents through elections of the people rather than through selections by appointment or elections by the State Assembly. It is wrongly cited as having either expressly or impliedly decided that a State cannot, if it wishes, permit its legislative body to elect its Governor." 385 U.S. at 233, 87 S.Ct. at 448.

Although later apportionment cases have been distinguished from "voting cases" such as *Gray*, see 52 Cornell Law Quarterly 790, 792 (1967), it is unlikely that the Court would have found any of these in point. So resolute was the Court in affirming the states' right to govern its election procedure that the Court neglected to point out that the Equal Protection Clause, as well as other provisions of the Constitution, act as a limit on the states' power with respect to elections. The Court did not, as we do here, judge the validity of the exercise of the state's power in light of the Equal Protection Clause. The *Fortson* Court was apparently content to rest its decision on the peremptory statement that "There is no provision of the United States Constitution or any of its amendments which either expressly or impliedly dictates the method a State must use to select its Governor." 385 U.S. at 234, 87 S.Ct. at 448.

22. *E. g.*, Harper v. Virginia Board of Elections, *supra* n. 15.

23. See n. 17, *supra*.

24. Hadley v. Junior College District, *supra* n. 18; Reynolds v. Sims, *supra* n. 17; Wesberry v. Sanders, *supra* n. 17.

25. *E. g.*, 16 Am.Jur.2d Constitutional Law, sec. 494 (1960).

Rather, the Fourth District's inequality will be transitory and isolated, brought on by a series of unfortunate circumstances unlikely to occur with any great frequency or widespread incidence in the future.

■ Appointment to fill a legislative vacancy is a well-recognized practice in American law.[26] It is a reasonable and necessary procedure to cope with an emergency situation[27] and, as such, is well within the constitutional boundary of the state's power to regulate elections.

Plaintiff's assumption that the governor's appointee will be a nonentity, insensitive to the needs and wishes of the voters of the Fourth District, not only adds but little weight to plaintiff's argument, but is also entirely unjustified. It must be assumed that the governor and any appointee would act in good faith and seek to protect the interests of the Fourth District's voters as best they could. If any additional incentive were necessary, certainly the desire for election at the end of his appointed term should provide the same to an appointee.

The above reasoning substantially weakens the minor premise of plaintiff's syllogism, i. e., that gubernatorial appointment would result in a situation tantamount to a legislative apportionment of three senators to the Fourth District.

Plaintiff's malapportionment argument must be rejected.

## B. *Irrational Classification*

■ The procedures for filling a vacancy in the Hawaii senate are set out in § 17–3 of Hawaii Revised Statutes, as amended. Subsection (1) provides that if the vacancy occurs ten days or more prior to the close of filing for the next succeeding primary election, the vacancy is to be filled for the unexpired term at the next succeeding general election. Subsection (2) provides that if the vacancy occurs less than ten days prior to the close of filing for the next succeeding primary election, but ten or more days prior to the next succeeding general election, the vacancy is to be filled for the unexpired term at the next succeeding general election. Both subsections (1) and (2) provide for gubernatorial appointment pending election. Subsection (3) provides that if the vacancy occurs less than ten days prior to the next succeeding general election, the governor is to make an appointment for the remainder of the unexpired term.

General elections are held on the first Tuesday after the first Monday of even numbered years.[28] Elections for state senator are held every four years.[29] Thus if a vacancy is created under subsections (1) or (2)—by a senator's death *while in office*, for example—the maximum term of a gubernatorial appointment would be two years.[30] Should the vacancy occur within ten days of a general election, the maximum term of a gubernatorial appointment would be two years and nine days.

Yet, under the present state laws if a vacancy is created in the *candidacy* for the office of state senator, the governor is empowered to appoint a state senator for a full four-year term. State v. Gill, Hawaii Sup.Ct., 477 P.2d 625 (1970).

---

26. See, e. g., Alaska Const., art. II, sec. 4 (appointment by governor if legislature has not yet passed a law regarding vacancy), Nevada Const., art. IV, sec. 12 (appointment by county commissioners).

27. See 42 Am.Jur. Public Officers, sec. 130 (1942). The Seventeenth Amendment of the United States Constitution provides that a state legislature may empower the state's executive to make a temporary appointment to fill a vacancy from that state in the United States Senate. The use of federal analogy is, however, inapposite in a case such as this. See Gray v. Sanders, 372 U.S. at 378, 83 S.Ct. at 807.

28. Hawaii Const., art. II, sec. 5.

29. *Id.*, art. III, sec. 5.

30. This would occur if the senator were to die the very day he was elected. Art. III, sec. 5 of the Hawaii Constitution provides that a senator's term of office begins with his election.

Section 17-3 of the H.R.S., as amended, provides for filling of senatorial vacancies at the next general election, except where, as under subsection (3) shortness of time makes this unfeasible. When a vacancy occurs in the candidacy for a senatorial seat, *more than* two years before the relevant general election under § 17-3, when there is ample time to arrange for the filling of the vacancy at said general election, Hawaii law incredibly provides for a *longer* term of gubernatorial appointment with *no* provision for election by the people at the next general election! The state's statutory and constitutional scheme for filling such senatorial vacancies is thus obviously irrational.

We find that § 17-3, coupled with legislative inaction in implementing Art. III, § 6, of the Hawaii Constitution to cover the present situation, operate to create an unconstitutional classification which deprives the voters of the Fourth District of the equal protection of laws guaranteed them by the United States Constitution.

Our holding in this regard is in no way inconsistent with our holding that the denial of equal protection due to "malapportionment" was not of constitutional significance. In part III A. of this decision we balanced the purported denial of equal protection to the voters of the Fourth District with the state's right to regulate its elections. Legally satisfied with the constitutionality of the state's vacancy-filling scheme, we evaluated the effective dilution of the vote in the Fourth District with respect to *all other voters in the state* and found that dilution to be more theoretical than real. We deal here with an entirely different classification and with entirely different standards of evaluation.

Section 17-3 and Art. III, § 6, do not by themselves set out a statutory class. Rather it is the conjoining of a natural event—*e. g.*, death of a candidate or incumbent—and the statutory response thereto which produces the classification.

Under such circumstances the voters of the Fourth District stand as a class, different and apart from voters in other districts whose senators have "providently" died after election to office. They are deprived of the right to vote to fill the vacancy from their district to the senate simply and solely because one of their senatorial candidates died *before* he could be elected.

There is nothing innately or constitutionally wrong with statutory or other classifications. However, "a statutory discrimination must be based on differences that are reasonably related to the purposes of the Act in which it is found." [31] Once the purposes of the act are divined, the classifications created by the act must directly further the purposes of the act in order to withstand constitutional attack on the ground of denial of equal protection.

In Morey v. Doud, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957), Illinois passed an act providing for, inter alia, the licensing, inspection, bonding, and regulation of currency exchanges selling money orders. American Express was exempted from compliance with the provisions of the act. The Supreme Court held that the Illinois act created an unconstitutional classification. The purpose of the act was to protect the public when dealing with currency exchanges. Distinguishing American Express from other currency exchanges was not rationally related to the purposes of the act, since it could not be assumed that American Express would forever remain financially solvent.

Decisions of the Supreme Court indicate that there is to be *no* balancing where an irrational classification is involved. In Southen Ry. Co. v. Greene, 216 U.S. 400, 417, 30 S.Ct. 287, 291, 54 L.Ed. 536 (1910), the Court stated that

> "While reasonable classification is permitted, without doing violence to the equal protection of the laws, such classification must be based upon some real and substantial distinction, bear-

31. Morey v. Doud, 354 U.S. 457, 465, 77 S.Ct. 1344, 1350, 1 L.Ed.2d 1485 (1957).

ing a just and reasonable relation to the things in respect to which such classification is imposed; and classification cannot be arbitrarily made without any substantial basis."

In Walters v. City of St. Louis, 347 U.S. 231, 237, 74 S.Ct. 505, 509, 98 L.Ed. 660 (1954), the Court noted that

"Equal protection does not require identity of treatment. It only requires that classification rest on real and not feigned differences, that the distinction have some relevance to the purpose for which the classification is made, and that the different treatments, be not so disparate, relative to the difference in classification, as to be wholly arbitrary."

Moreover, since voting is a fundamental right, this court's criterion of evaluation is stricter than it would be in the ordinary classification case.[32] As the Supreme Court noted in Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1963):

"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined."

In Evans v. Cornman, 398 U.S. 419, 422, 90 S.Ct. 1752, 1755, 26 L.Ed.2d 370 (1970), the Court declared that

"the right to vote, as the citizen's link to his laws and government is protective of all fundamental rights and privileges [citations omitted]. And before that right can be restricted the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny."

The purpose of § 17–3 and Art. III, § 6, is obviously to provide for the filling of vacancies in the state senate. Implicit in § 17–3 is the desire to permit filling of such vacancies by election at the ear-

liest general election after the vacancy occurs, that time will rationally permit. The state can point to no rationale for attaching the significance it has to the fortuitous timing of a candidate's or senator's death. The state's handling of this problem in fact flies in the face of the logic embraced by § 17–3. It in no way furthers the purpose of the state's vacancy-filling provisions to permit the governor to appoint a senator for a potential four year term where there has been a vacancy in the candidacy in the office of senate from a state senatorial district. Neither time nor money preclude election in the case of senatorial vacancies, except where the vacancy occurs within ten days of a general election. Yet, even in this case, the maximum term of a gubernatorial appointee would be two years and nine days. Thus time and money do not justify gubernatorial appointment for a potential four-year term. Nor can any other state of facts be conceived to sustain the state's classification.[33]

Admittedly, the state put itself in a constitutional bind by providing that the governor is to appoint a senator for a full term where the legislature has failed to provide for the filling of a vacancy. By passing *any* law regarding filling of vacancies, the state immediately sets up the possibility of different treatment for different classes of voters. If, as here, the legislature provides for a maximum appointment of two years and nine days, there results a direct inequality with gubernatorial appointment for as much as four years.

The state's difficulty is of no moment to the court. The state has wrought its own problems. The state's internal difficulties in no way lessen the duties of the court to enforce the constitution. The State's Constitution permits it to solve its problem by providing for gubernatorial appointment in all cases for the full unexpired term or by passing legis-

---

32. See Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1065, 1120 (1969); Harper v. Virginia Board of Elections, 383 U.S. at 670, 86 S.Ct. at 1083.

33. See Allied Stores of Ohio v. Bowers, 358 U.S. 522, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959).

lation to provide for vacancy situations, including such as the one involved here.

### IV.

We do not order a special election to fill the vacancy from the Fourth District. Rather we leave it to the governor and state legislature to provide for filling the vacancy in a manner not inconsistent with the reasoning of this decision. Several choices are available: special election for a full four-year term; special election for a term running until the next general election; gubernatorial appointment until next general election. The state itself is best aware of the many factors of time, money, etc., which might dictate the appropriate choice from those now suggested by the court. The state is not, of course, limited to these choices. Any procedure which reflects the reasoning behind this decision will satisfy the constitution and this court.

The state legislature in its regular session of 1971, apparently on April 16, has enacted legislation mandating special election procedures for filling the Fourth District's vacant seat in the senate. Thus this court cannot and does not fault the state's proposed procedure, inasmuch as this court assumes that the defendant herein, Governor Burns, will sign the bill.

This court retains jursdiction over this case, therefore, only until the legislative act becomes law.