David **LEFKOVITS** and John T. Meagher, Plaintiffs,

v.

**STATE BOARD OF ELECTIONS et al., Defendants,**

**Chicago Bar Association et al., Intervenors-Defendants.**

**No. 74 C 3591.**

United States District Court, N. D. Illinois, E. D.

Sept. 3, 1975.

William J. Harte, Herbert F. Stride, Chicago, Ill., for plaintiffs.

Arnold B. Kanter, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for Intervenor Chicago Council of Lawyers.

Maurice J. McCarthy, Chicago, Ill., for Ill. State Bar Ass'n.

William J. Scott, Atty. Gen., Herbert L. Caplan, Asst. Atty. Gen., Kusper, Jr. & Bernard J. Korzen, Bernard Carey, State's Atty., Richard K. Means, Asst. State's Atty., for State Board of Elections and others.

John F. McCarthy, McCarthy & Levin, Chicago, Ill., for intervenors Chicago Bar Ass'n.

## OPINION

Before FAIRCHILD, Chief Circuit Judge, and WILL and MARSHALL, District Judges.

MARSHALL, District Judge.

In the Illinois general election of November, 1974, Cook County Circuit Court Judge David Lefkovits was a qualified candidate for judicial retention. *Ill.Const. Art.* VI, § 12(d). John T. Meagher was then and is now a qualified elector residing in Cook County, Illinois who cast his ballot in favor of Judge Lefkovits' retention. The final canvass of the votes revealed that only 59.8% of the electors casting ballots on the question of the Judge's retention voted in the affirmative. Having failed to receive the affirmative vote of three-fifths of the electors, the Illinois Constitution required that Judge Lefkovits' position as a circuit court judge be declared vacant. *Ill.Const.* Art. VI, § 12(b).

To avoid this result, Judge Lefkovits and Mr. Meagher filed an action in the Circuit Court of Cook County seeking declaratory and injunctive relief that the three-fifths majority requirement for retention violates both the Illinois and United States Constitutions. They sought and obtained from the state

court a preliminary injunction restraining the defendants, who are various state and county officials responsible for determining election results, from interfering with the right of Judge Lefkovits to serve as a circuit court judge, from declaring that he had not been retained and from declaring his office vacant.

Thereafter, the defendants removed the action to this court, 28 U.S.C. § 1441 (1970), and requested that a three-judge court be convened. 28 U.S.C. § 2281 (1970). Defendants correctly maintain that subject matter jurisdiction is here under 28 U.S.C. § 1331 as well as under 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3). Because the plaintiffs sought a permanent injunction restraining the defendant state and local officials from enforcing the retention provision of the Illinois Constitution on the theory that the provision violated the United States Constitution, a three-judge court was impaneled. 28 U.S.C. § 2281 (1970); *Wojcik v. Levitt,* 513 F.2d 725 (7th Cir. 1975).

█ Shortly after removal here, Judge Lefkovits voluntarily relinquished his judgeship, retired and withdrew from the action.[1] At the same time, the Illinois State Bar Association, the Chicago Council of Lawyers, and the Chicago Bar Association were granted leave to intervene. *Fed.R.Civ.P.* 24. The state and intervening defendants have now moved to dismiss the action for failure to state a claim upon which relief can be granted or in the alternative for summary judgment. *Fed.R.Civ.P.* 12(b)(6) and 56.

The Illinois court system is akin to the federal system. The courts of original jurisdiction are the circuit courts, followed by five intermediate appellate courts, and the Illinois Supreme Court. When selected initially to serve a full term, all of the judges of those courts (except associate judges of the circuit courts) are nominated at primary elections or by petition, elected at general elections, *Ill. Const.* Art. VI, § 12(a), by a plurality of the votes cast on the question, *Ill.Rev.Stat.,* ch. 46, § 22–7 (1973), and serve a term of six years. *Ill. Const.* Art. VI, § 10. Associate judges of the circuit courts are appointed by the circuit judges as provided by the rules of the Illinois Supreme Court. *Ill. Const.* Art. VI, § 8; Ill.Sup.Ct. Rule 39, *Ill.Rev.Stat.,* ch. 110A, § 39 (1973).

Once elected, a judge may, at the expiration of his term, run for retention rather than for reelection. The retention provision of the Illinois Constitution provides:

> Not less than six months before the general election preceding the expiration of his term of office, a Supreme, Appellate or Circuit Judge who has been elected to that office may file in the office of the Secretary of State a declaration of candidacy to succeed himself. The Secretary of State, not less than 63 days before the election, shall certify the Judge's candidacy to the proper election officials. The names of Judges seeking retention shall be submitted to the electors, separately and without party designation, on the sole question whether each Judge shall be retained in office for another term. The retention elections shall be conducted at general elections in the appropriate Judicial District, for Supreme and Appellate Judges, and in the circuit for Circuit Judges. The affirmative vote of three-fifths of the electors voting on the question shall elect the Judge to the office for a term commencing on the first Monday in December following his election.[2]

---

1. We take judicial notice of the appointment of Jose Vasquez to the office of circuit court judge on January 11, 1975, effective February 1, 1975, by the Illinois Supreme Court to fill the vacancy left by Judge Lefkovits. *Fed.R.Evid.* 201(b) and (f) (effective July 1, 1975).

2. The provisions of this section, which is the center of the present controversy, allow pre-

If he fails to receive the 60 percent, as was the case with Judge Lefkovits, a vacancy in the office is declared and a new judge is appointed by the Illinois Supreme Court to serve until the next general election, at which time he may run for election, but not retention.

If a judge is eligible to seek retention, he apparently need not do so. He could run for reelection, which requires only a plurality of the vote, but he would also have to gain renomination through a primary or petition. As a consequence, no judge eligible for retention has sought reelection.

Judge Lefkovits was elected to the position of circuit court judge in 1968, and his term of office expired in 1974. He sought retention. And, as previously noted, he failed to receive the percentage of votes necessary to retain his office.[3]

The amended complaint is in two counts. Count I asserts various grounds for relief in behalf of Judge Lefkovits and Meagher. Since the Judge has withdrawn from the case, there is no need to consider his contentions. Meagher, however, asserts that if Judge Lefkovits is not allowed to retain his seat because of the 60% affirmative vote requirement, he and the class he assertedly represents[4] will be deprived of rights guaranteed them under both the United States and Illinois Constitutions. Specifically, the supermajority requirement (1) violates the equal protection clause of the Fourteenth Amendment;[5] (2) "violates the Fourteenth Amendment to the United States Constitution in that the three-fifths affirmative [sic] fails to guarantee every citizen a republican form of government and thwarts the majority will of the people in the election of judges for retention;"[6] (3) and violates the equal protection clause of the Illinois Constitution, Art. I, § 2, in that it deprives him of his right to have his vote counted equally and without dilution along with the other votes of residents of Cook County.

The second count of the amended complaint realleges all of Count I and states additionally that Meagher will vote in the next general election for the retention of judges in the Circuit Court of Cook County, who will be subject to the 60% requirement of Section 12(d), and, as a result thereof, he will suffer the same constitutional deprivations alleged in Count I.

The Illinois State Bar Association urges in its memorandum in support of the motion to dismiss that Meagher lacks standing under Count I to press the claims of Judge Lefkovits and that as to Meagher and the class he represents, the case is moot because Judge Lefkovits has since retired and taken judicial pension.[7] We agree that Meagher does not have standing to as-

---

viously elected judges to serve an additional term in office without running in a contested election. The judge seeks retention solely on the basis of his record and does not run against any other individual or party. Unlike an election, however, the judge seeking retention must receive the affirmative vote of 60% of the electors voting on his retention to enable him to serve another term.

3. The failure to be retained does not bar a judge from running for the same office in a subsequent election, although the practicality of so doing is questionable. Comments of Delegates Fay and Lewis, III Proceeding of the Illinois Constitutional Convention 2395, 2399 (1972).

4. Because of the disposition of the case, there is no need to decide whether the suit should be allowed to proceed as a class action.

5. Complaint, ¶ 12(c).

6. *Id.* ¶ 13(d).

7. "The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed. *See, e. g., Roe v. Wade,* 410 U.S. at 125, 93 S.Ct. 705; *SEC v. Medical Com'n for Human Rights,* 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972). *United States v. Munsingwear, Inc.,* 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950)." *Steffel v. Thompson,* 415 U.S. 452, 458 n. 10, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974).

sert claims on behalf of Judge Lefkovits. *See Sierra Club v. Morton,* 405 U.S. 721, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *United States v. S.C.R.A.P.,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). But, while the argument relating to mootness is persuasive, *cf. DeFunis v. Odegaard,* 416 U.S. 312, 94 S. Ct. 1704, 40 L.Ed.2d 164 (1974) (per curiam); *Golden v. Zwickler,* 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969), there is no need to decide the issue since the disposition of Count II, which clearly presents a live case or controversy that Meagher has standing to pursue, would similarly dispose of the claims asserted under Count I.[8]

The complaint raises three asserted denials of constitutional rights. One is that the equal protection clause of the Illinois Constitution, Art. I, § 2, is violated by the retention article of the same constitution. This contention is without merit and the plaintiff has not offered any argument in its support. Clearly, if a state constitution mandates a particular manner of electing officials, *ipso facto* the provision is constitutional under the state constitution, notwithstanding the existence of a general state constitutional provision that could be read to prohibit the same procedure if enacted as a statute.[9]

In addition to his state claim, the plaintiff asserts two contentions under the Federal Constitution. The first of these is that the three-fifths requirement violates the guaranty clause of the United States Constitution.[10] This argument is foreclosed by the Supreme Court's landmark decision in *Luther v. Borden,* 48 U.S. (7 How.) 1, 42, 12 L.Ed.

581 (1849), in which the Court held that claims that a state failed to provide a republican form of government were nonjusticiable and therefore not cognizable by the federal courts. *See Baker v. Carr,* 369 U.S. 186, 218–224, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

The remaining contention is that the three-fifths requirement denies the plaintiff the equal protection of the laws guaranteed by the Fourteenth Amendment, in that his affirmative vote for retention of judges is diluted and debased by the extraordinary majority requirement.[11] This argument presents a federal question which is not "wholly insubstantial" (*Bailey v. Patterson,* 369 U.S. 31, 33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962)) and upon which there is no direct authority. Fortunately, however, the Supreme Court has considered an extraordinary majority requirement in another context and that decision is a logical starting point of analysis.

In *Gordon v. Lance,* 403 U.S. 1, 91 S. Ct. 1889, 29 L.Ed.2d 273 (1971), the Court reviewed the constitutionality of a 60% vote requirement to raise the public debt. The Constitution and statutes of West Virginia provided that political subdivisions of the state could not incur bonded indebtedness or increase taxes beyond certain constitutional limitations without the affirmative approval of 60% of the voters in a referendum election. In 1968, a local board of education proposed the issuance of general obligation bonds and a levy of additional taxes to finance certain expenditures and capital improvements. Both proposals received a majority vote, but failed to obtain the required 60% approval. There-

---

8. That plaintiff Meagher has standing is settled by *Baker v. Carr,* 369 U.S. 186, 204–208, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and its progeny.

9. The provision of the state Constitution could, however, violate the Federal Constitution, and if such is the case the sovereignty of the people to adopt their own constitution must give way to the limitations imposed by the United States Constitution. *See Hunter*

*v. Erickson,* 393 U.S. 385, 392, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969).

10. "The United States shall guarantee to every State in this Union a Republican Form of Government . . . ." *U.S.Const.* Art. IV, § 4.

11. Although the argument is pleaded rather obscurely, this is the position that emerges upon a reading of the plaintiff's briefs.

upon a number of individuals who had voted in favor of the proposals brought an action in the state court to declare the extraordinary majority requirement unconstitutional as violative of the equal protection clause of the Fourteenth Amendment. Relying heavily on *Gray v. Sanders,* 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), and *Cipriano v. City of Houma,* 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969), the Supreme Court of West Virginia agreed with plaintiffs. *Lance v. Board of Education,* 153 W.Va. 559, 170 S.E.2d 783 (1969), *noted in* 83 *Harv.L.R.* 1911 (1970).

Reversing the decision of the West Virginia court, the Supreme Court first distinguished *Gray* and *Cipriano.*

> We conclude that the West Virginia court's reliance on the *Gray* and *Cipriano* cases was misplaced. The defect this Court found in those cases lay in the denial or dilution of voting power because of group characteristics—geographic location and property ownership—that bore no valid relationship to the interest of those groups in the subject matter of the election; moreover, the dilution or denial was imposed irrespective of how members of those groups actually voted.[12]

In the process of distinguishing those two cases, the Court delineated the three broad areas in which it had concluded that state electoral laws violated the equal protection clause. The first set of cases, such as *Gray,* involved geographic factors or state districting and apportionment which had weighted or diluted the votes of some citizens as against others. Collectively these cases are usually referred to as the one-person-one-vote decisions. *See, e. g., Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); *Hadley v. Junior College District of Metropolitan Kansas City,* 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970); *Reynolds v.*

*Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L. Ed.2d 506 (1964).

The second area concerned cases in which states had excluded certain classes of citizenry from the ballot. For example, in *Kramer v. Union Free School District,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), the Court held that a state could not, consistent with the equal protection clause, limit the franchise in school board elections to those individuals who owned or leased taxable real property in the district, or who were parents or guardians of a child of school age, since the statute was both over and under inclusive in classifying those who were primarily interested in school board elections. 395 U.S. at 632, 89 S.Ct. 1886. *See also, Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L. Ed.2d 274 (1972) (duration of residency requirements); *Carrington v. Rash,* 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965)(military status).

A third class of voting cases which has run afoul of the equal protection clause is typified by *Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969). There, the City of Akron, Ohio, enacted an ordinance that made the passage of open housing ordinances more difficult than other city ordinances. The Court concluded that the ordinance violated the equal protection clause because it singled out a distinct class—"those who would benefit from laws barring racial, religious, or ancestral discrimination," (393 U.S. at 391, 89 S.Ct. at 560) and imposed upon its members special burdens within the governmental process. The Court concluded:

> [T]he State may no more disadvantage any particular group by making it more difficult to enact legislation in its behalf than it may dilute a person's vote or give any group a smaller representation than another of comparable size. *Cf. Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d

12. 403 U.S. at 4, 91 S.Ct. at 1891, 29 L.Ed.2d at 275 (footnote omitted).

506 (1964); *Avery v. Midland County*, 390 U.S. 474, 88 S.Ct. 1114, 20 L. Ed.2d 45 (1968).[13]

Applying the principles announced in these three classes of cases, the Court held in *Gordon* that the 60 percent voting requirement did not violate the equal protection clause. The state did not impose any element of geographic discrimination in its voting requirement. Nor did it fence out any particular group of people because of the way they vote or impose an extraneous condition on the right to exercise the franchise. All that West Virginia did was to make some forms of governmental action more difficult.

> Certainly any departure from strict majority rule gives disproportionate power to the minority. But there is nothing in the language of the Constitution, our history, or our cases that requires that a majority always prevail on every issue. On the contrary, while we have recognized that state officials are normally chosen by a vote of the majority of the electorate, we have found no constitutional barrier to the selection of a Governor by a state legislature, after no candidate received a majority of the popular vote. *Fortson v. Morris*, 385 U.S. 231, 87 S.Ct. 446, 17 L.Ed.2d 330 (1966).

> The Federal Constitution itself provides that a simple majority vote is insufficient on some issues; the provisions on impeachment and ratification of treaties are but two examples. Moreover, the Bill of Rights removes entire areas of legislation from the concept of majoritarian supremacy. The constitutions of many States prohibit or severely limit the power of the legislature to levy new taxes or to create or increase bonded indebtedness, thereby insulating entire areas from majority control. Whether these

matters of finance and taxation are to be considered as less "important" than matters of treaties, foreign policy, or impeachment of public officers is more properly left to the determination by the States and the people than to the courts operating under the broad mandate of the Fourteenth Amendment. . . .

> \*    \*    \*    \*    \*    \*

> We conclude that so long as such provisions do not discriminate against or authorize discrimination against any identifiable class they do not violate the Equal Protection Clause. We see no meaningful distinction.[14]

The decision and logic of *Gordon* are, despite the Court's disclaimer in footnote six that it was expressing no opinion on the issue of whether the states could constitutionally require extraordinary majorities in the election of public officials, persuasive on the question *sub judice* for the Illinois retention system is in essence a referendum on whether a particular judge shall be retained in office. Nevertheless, the Court's disclaimer requires a further examination of the Illinois judicial retention article and the equal protection clause arguments asserted against it.

■ The first step in deciding whether Section 12(d) of Article VI of the Illinois Constitution violates the equal protection clause is to determine if an identifiable class exists against which the section can be said to authorize discrimination. Clearly, if the section does not authorize discrimination against an identifiable class there can be no violation of the equal protection clause. *Gordon v. Lance*, 403 U.S. at 5, 91 S.Ct. 1889.

The Illinois constitutional provision does not arbitrarily deny the franchise to any particular group. All otherwise qualified voters are entitled to vote on

---

13. 393 U.S. at 393, 89 S.Ct. 557. *See Reitman v. Mulkey*, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), *But see James v. Valtierra*, 402 U.S. 137, 91 S.Ct. 1331, 28 L. Ed.2d 678 (1971).

14. 403 U.S. at 6–7, 91 S.Ct. 1889, 1892, 29 L.Ed.2d 276–277 (footnotes omitted).

the question of whether a judge should be retained. Thus there can be no contention that the section violates the equal protection clause in the manner found offensive in cases such as *Kramer v. Union Free School District*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), or *Carrington v. Rash*, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965).

Granted that there is no particular class of voters disenfranchised by an outright denial of the ballot, the plaintiff still maintains that the retention provision cannot be sustained when examined against the one-person-one-vote decisions. Simply stated, the plaintiff asserts that weighting the votes of those who oppose retention more heavily than those who favor retention results in an unconstitutional dilution of the votes of the class of voters who favor retention.

The defendants have all strenuously asserted that the one-person-one-vote cases are inapplicable to the judiciary and therefore offer no support for the plaintiff's position. In support of this argument, they rely on a number of district court decisions holding that the judiciary need not be apportioned on a strict population basis. For example, in *Holshouser v. Scott*, 335 F.Supp. 928 (N.D.N.C.1971) (3-judge court), *aff'd*, 409 U.S. 807, 93 S.Ct. 43, 34 L.Ed.2d 68 (1972), the plaintiffs alleged that the North Carolina system of nominating judges by district and then subjecting them to statewide election violated the principle of one-person-one-vote. The district court first held that judges, unlike legislators or other officials who

represent people,[15] need not be apportioned on the basis of population because they do not govern or represent a particular constituency. "They must decide cases exclusively on the basis of law and justice and not upon the popular view prevailing at the time." 335 F.Supp. at 932. The court then went on to hold that a state method of selecting judges could be struck down only if there was a showing of an arbitrary or invidious distinction between citizens and voters, a conclusion which did not follow from the North Carolina Constitution and statutes since in both the primary and general election each vote counted the same.[16]

*Holshouser* and the cases referred to above are not, however, dispositive of the plaintiff's equal protection claim that a majority must prevail on the retention ballot. Those cases merely hold that judges need not be apportioned on a population basis because the functions they perform are not of the same nature as those elected officials to which the equality of population principle has been applied. But when a judge is to be elected or retained, regardless of the scheme of apportionment, the equal protection clause requires that every qualified elector be given an equal opportunity to vote and have his vote counted. This is the essence of the one-person-one-vote principle.

To decide that the Illinois judicial retention article must be compatible with the one-person-one-vote requirement only begins the inquiry. The next step is to determine the scope of the principle and

---

15. *See Hadley v. Junior College District*, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970).

16. A number of other district courts have considered challenges to the apportionment of state judiciaries. In each instance the court has concluded that the one-person-one-vote principle did not require that the judiciary be apportioned on a population basis. *Wells v. Edwards*, 347 F.Supp. 453 (N.D.La.1972) (3-judge court), *aff'd*, 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973) (Justices of the Louisiana Supreme Court); *New York State Ass'n of Trial*

*Lawyers v. Rockefeller*, 267 F.Supp. 148 (S.D.N.Y.1967) (lower court judges need not be apportioned on a per capita basis); *Buchanan v. Rhodes*, 249 F.Supp. 860 (N.D.Ohio, 1962) (judges need not be apportioned on the basis of population); *Stokes v. Fortson*, 234 F.Supp. 575 (N.D.Ga.1964) (3-judge court) (State constitutional provision requiring judges and solicitor generals to be nominated by district and elected statewide did not violate the equal protection clause). None of these cases, however, dealt with a requirement that a judge be elected or retained by an extraordinary majority.

its applicability to the particular facts at hand.

In *Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), the Court struck down the county unit voting system employed in Georgia to nominate United States Senators and statewide officers. The effect of the system was to give counties with small populations an inordinate amount of voting power as compared with counties with a large population. The Court concluded that this geographical weighting of votes between rural and urban voters was impermissible.

Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote . . . . The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote.[17]

In *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the Court considered whether the apportionment of the Alabama legislature conformed to the guarantees of the equal protection clause. Both houses of the legislature were apportioned in such a manner that sparsely populated rural districts were given equal representation with far more populous urban ones. The Court concluded that the legislative districting could not stand. As nearly as practical the districts had to be constructed of equal numbers of people.

The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.[18]

The one-person-one-vote equality of representation principle of *Reynolds* was subsequently extended in a number of other cases requiring numerically equal population apportionment in the case of Congressmen, state legislators, county commissioners, and school boards. *Kirkpatrick v. Preisler*, 394 U.S. 526, 89 S. Ct. 1225, 22 L.Ed.2d 519 (1969), *Lucas v. Forty-Fourth General Assembly*, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964); *Avery v. Midland County*, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968); *Hadley v. Junior College District*, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed. 2d 45 (1970).

From these cases the plaintiff argues that, by requiring a 60% affirmative vote for the retention of judges, Illinois has diluted and debased the vote of the class of voters who favor the retention of a particular judge, and that the state cannot, consistent with the equal protection clause, require that a judge obtain more than a majority vote to be retained.

There are several flaws in the plaintiff's argument. The first is the assumption that the one-person-one-vote paradigm implies that a super majority requirement unconstitutionally dilutes or discounts a person's vote. *Gray* and *Reynolds*, however, concerned instances in which the state electoral process weighted or diluted a citizen's vote on the basis of where he lived. The Illinois judicial retention process does not suffer from this infirmity. Each voter is entitled to cast one vote and that vote is counted at the same value as any other voter's. There is no geographic discounting. What the plaintiff complains of is that his vote does not have the same marginal impact on the outcome of the election as a voter of a different persuasion. Or, stated another way, he

---

17. 372 U.S. at 379, 381, 83 S.Ct. at 808 (footnotes omitted).

18. 377 U.S. at 555, 84 S.Ct. at 1378. *See Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).

does not have an equal opportunity to have his policy preference prevail at the polls. *See* 83 *Harv.L.Rev.* 1911, 1915, 1916 (1970). This latter argument is merely an assertion that the majority will must prevail in a judicial retention election.

The Supreme Court, despite some language in the reapportionment cases to the contrary,[19] has never embraced a strict majoritarian philosophy. Rather, it is more appropriately characterized as a philosophy of egalitarianism. Linde, "Judges, Critics, and the Realist Tradition," 82 *Yale L.J.* 227, 230 (1972).[20] For example in *Fortson v. Morris*, 385 U.S. 231, 87 S.Ct. 446, 17 L.Ed.2d 330 (1966), the Court upheld the right of the Georgia state legislature to select a governor from the two candidates with the largest vote if no candidate received a majority in the election, although the process could and did result in the election of a governor who did not receive the highest number of votes at the general election. The rejection of a majoritarian rule of decision becomes all the more obvious with *Gordon v. Lance, supra, Abate v. Mundt*, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971), and *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), the latter two decisions rejecting equal protection claims against multimember legislative districts and an apportionment scheme with an 11.9% population variation. As Mr. Justice Harlan stated in his concurring opinion in *Whitcomb*, "If this philosophy of majoritarianism had been given its head, it would have led to different results in each of the cases decided today [*Gordon, Abate*, and *Whit-*

*comb*], for it is in the very nature of (1973); *Hunter v. Erickson*, 393 U.S. the principle that it regards majority rule as an imperative of social organization, not subject to compromise in the furtherance of merely political ends."[21]

The preceding discussion necessitates the conclusion that a denial of majoritarianism does not deny political equality to those who favor the retention of judges. Thus plaintiff must go further and show that the retention provision is designed to dilute the voting or representational strength of a particular identifiable political element. *See White v. Secretary of State of Texas*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1969); *LoFrisco v. Schaffer*, 341 F.Supp. 743 (D.Conn.) (3-judge court), *aff'd*, 409 U.S. 972, 93 S.Ct. 313, 34 L.Ed.2d 236 (1972); *Kaelin v. Warden*, 334 F.Supp. 602 (E.D.Pa.1971).

The plaintiff's pleadings and briefs do not show that the Illinois retention provision was designed to or has the effect of denying or diluting the voting or representational strength of a particular identifiable group.[22] The most that can be said is that in some future retention election a now inchoate group of voters may organize themselves in sufficient numbers to defeat the retention of a particular judge with whom they are dissatisfied by a total vote of less than 50 percent.

We earlier observed that *Gordon v. Lance, supra*, was persuasive authority in support of the validity of the Illinois judicial retention process. Because of the Supreme Court's disclaimer that *Gordon* did not decide whether states

19. *See, e. g., Reynolds v. Sims*, 377 U.S. 533, 565–66, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Fortson v. Morris*, 385 U.S. 231, 251, 87 S.Ct. 446, 17 L.Ed.2d 330 (1966) (Fortes, J., dissenting).

20. *But see*, A. Bickel, *The Supreme Court and the Idea of Progress*, 108–15 (1970).

21. 403 U.S. at 167, 91 S.Ct. at 1882.

22. The plaintiff makes the bold assertion that various minorities in Chicago (blacks, browns and the Polish) suffer a chilling effect because of the 60% requirement. No explanation is given as to how the supposed chilling effect works or whether it has operated to deny a judge's retention. The most plaintiff has done is establish the existence of numerous minority groups in Cook County. That is a far cry from establishing that the retention provision discriminates against any of these groups.

could require extraordinary majorities in the election of public officials, an examination of the Illinois retention provision has been undertaken. We conclude that the provision in essence calls for a referendum, not an election, on the proposition of whether a particular judge shall be retained in office. In such circumstances, an extraordinary majority requirement is constitutionally permissible so long as it does not discriminate against an identifiable class of voters.

■ It should be noted, however, that the question of whether a judge or any public official can be required to be elected by more than majority vote has not been decided. All we have concluded is that the retention of judges may, consistent with the equal protection clause, be subject to an affirmative vote of 60% of the electors casting ballots on the question. Under the Illinois system, the minority can never elect a judge. Its power is solely limited to blocking retention. Once a judge is not retained, the Illinois Supreme Court fills the vacancy created and the appointee serves until the next election at which time he must run for election.

■ There can be no dispute that Illinois has broad and sweeping powers over the organization of its courts. It may define the jurisdiction of its "several courts, either as to their territorial limit or to subject matter, amount, or finality of their respective judgments." *New York State Ass'n of Trial Lawyers v. Rockefeller*, 267 F.Supp. 148, 151 (S. D.N.Y.1967). *See Mallet v. North Carolina*, 181 U.S. 589, 597–99, 21 S.Ct. 730, 45 L.Ed. 1015 (1901). And it has the power to prescribe the manner in which it selects judges. *Sugarmann v. Dougall*, 413 U.S. 634, 647, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1974); *Boyd v. Thayer*,

143 U.S. 135, 161, 12 S.Ct. 375, 36 L.Ed. 103 (1892).

Illinois has decided that its judges shall be elected in the first instance, and thereafter a judge may run on his record for retention without opposition from any other candidate. The Illinois judicial article, *Ill.Const.* Art. VI, was the subject of extensive debate at the Illinois Constitutional Convention in 1969 and 1970. Some delegates favored an appointment plan for the selection of judges, while others favored an elective system. Those who favored election prevailed. But even in this there was a great deal of dispute, one area of which was the retention system. Some delegates favored only a 50% requirement, VI *Record of Proceedings of the Sixth Illinois Constitutional Convention*, 1100–1101 (1972) (Judiciary Minority Proposal 3A at 34–35), others preferred a requirement as high as 66⅔%. III *Proceedings*, 2393–2400 (1972). The Convention compromised on a figure of 60%,[23] which represented an accommodation among a number of competing interests. On one hand, the majority recognized that a form of tenure was necessary to guarantee the independence of the judiciary, while on the other hand, it was felt that there had to be a method of allowing the electorate to remove those judges in whom, for one reason or another, they no longer had confidence. The majority felt that a requirement of less than 60% would make it almost impossible to remove judges who had lost public confidence. VI *Proceedings*, 1030–31 (1972) (Judiciary Committee Proposal 3, at 89–90).

Whether the Illinois retention provision is a wise manner of securing the tenure and independence of the Illinois judiciary is, of course, not the issue presented.[24] Wisely or not, the people

---

23. *See, e. g.,* III *Proceedings*, 2294–2296, 2298, 2303, 2318–19, 2329–30, 2339, 2393–2400.

24. For a discussion of the retention system and the voting requirements, see Cohn, "The

Illinois Judicial Department Changes Effected by the Constitution of 1970," 1971 *U.Ill.L. Forum*, 355, 401; Bane, "The Need for Reexamination of the Illinois Constitution," 50 *Chi.Bar Rec.*, 18, 19–20 (1968).

of Illinois have resolved that a simple majority is insufficient to retain a judge for another term of office. *Cf. Gordon v. Lance,* 403 U.S. 1, 7, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971). Since the 60% requirement *does not discriminate* against or authorize discrimination against any identifiable class there is no violation of the equal protection clause.

Defendants' alternative motion to dismiss or for summary judgment should be granted. Judgment will enter dismissing plaintiff's action.